UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:15-cv-831

ELIZABETH HENRY,
AART SCHULENKLOPPER,
EILEEN CARTER,
SHONDELL JONES,
JAN BURKHARD-CATLIN, and
LINDSAY PURRINGTON,

        Plaintiffs,

   v.

NORTH CAROLINA ACUPUNCTURE
LICENSING BOARD,
EMMYLOU NORFLEET,
M. CISSY MAJEBE,
KAREN VAUGHN,
VIKKI ANDREWS,
CHESTER PHILLIPS, and
MARC CUTLER,

        Defendants.

**COMPLAINT**

## NATURE OF THE ACTION

1.    This lawsuit is about private health care practitioners who use their positions on a government board to prohibit their competitors from competing.

2.    The North Carolina Acupuncture Licensing Board is the state agency in North Carolina that regulates the practice of acupuncture. The Acupuncture Board is controlled by a supermajority of practicing acupuncturists. In their private practices, these acupuncturists compete against various health care professionals, including physical therapists.

3. This competition is desirable because it promotes the interests of consumers. When physical therapists compete with acupuncturists, consumers get to decide which services they want and how much they are willing to pay for them. As a result, the consumer wins.

4. In recent years, the number of physical therapists who compete with acupuncturists in North Carolina has grown. In response to that competitive threat, North Carolina's acupuncturists looked to their colleagues on the Acupuncture Board to take action.

5. Succumbing to their own self-interests and pressure from their fellow acupuncturists, the members of the Acupuncture Board are using their government power to expel physical therapists from the market. Their anticompetitive actions include, most notably, sending "cease and desist" letters to physical therapists with the intent to drive them from the marketplace.

6. The Acupuncture Board is engaging in this conduct despite its own admission that it "does not have jurisdiction over any other practitioner in this state other than licensed acupuncturists." It is engaging in this conduct despite its own admission that it "could be seen as professional protectionism in the eyes of law enforcement."

7. The Acupuncture Board's actions have real consequences. Plaintiffs Elizabeth Henry and Aart Schulenklopper are physical therapists who received the Acupuncture Board's cease-and-desist letters; their ability to earn a living is under threat. Plaintiffs Eileen Carter and Shondell Jones are physical therapists who want to enter the

market but are afraid to do so; they fear that the Acupuncture Board will pursue "unauthorized practice" allegations against them. Plaintiffs Jan Burkhard-Catlin and Lindsay Purrington are professional ballet dancers whose job performance depends on the treatment they get from physical therapists; they want to continue getting that treatment and they do not want to be forced to get acupuncture instead—especially if they will be deprived of the benefits of price competition. Like all consumers, they do not want to pay more for less.

8. Plaintiffs have brought this lawsuit to hold the Acupuncture Board and its members accountable for their conduct under the federal antitrust laws and the United States Constitution.

## THE PARTIES

9. Plaintiff Elizabeth Henry is a licensed physical therapist. Dr. Henry is a resident of Wilmington, North Carolina.

10. Plaintiff Aart K. Schulenklopper is a licensed physical therapist. Dr. Schulenklopper is a resident of Greensboro, North Carolina.

11. Plaintiff Shondell Jones is a licensed physical therapist. Dr. Jones is a resident of Greenville, North Carolina.

12. Plaintiff Eileen Carter is a licensed physical therapist. Ms. Carter is a resident of Wilson, North Carolina. She will receive her doctorate in physical therapy in January 2015.

13. Plaintiff Jan Burkhard-Catlin is a resident of Raleigh, North Carolina.

14.     Plaintiff Lindsay Purrington is a resident of Raleigh, North Carolina.

15.     The North Carolina Acupuncture Licensing Board is the North Carolina state agency charged with regulating the practice of acupuncture. Its principal place of business is 1101 Haynes Street, Suite 100, in Raleigh, North Carolina.

16.     Defendant Emmylou Norfleet is a member and current Chair of the Acupuncture Board. Dr. Norfleet is a licensed acupuncturist in Asheville, North Carolina. Upon information and belief, Dr. Norfleet offers acupuncture services through her company, the Chinese Acupuncture and Herbology Clinic.

17.     Defendant M. Cissy Majebe is a member and current Secretary of the Acupuncture Board. Dr. Majebe is a licensed acupuncturist in Asheville, North Carolina. Upon information and belief, like Dr. Norfleet, Dr. Majebe also offers acupuncture services through her company, the Chinese Acupuncture and Herbology Clinic.

18.     Defendant Karen Vaughn is a member of the Acupuncture Board. Dr. Vaughn is a licensed acupuncturist in Wilmington, North Carolina. Upon information and belief, Dr. Vaughn offers acupuncture services through her company, The Acupuncture Alternative.

19.     Defendant Chester Phillips is a member of the Acupuncture Board. Dr. Phillips is a licensed acupuncturist in Raleigh, North Carolina. Upon information and belief, Dr. Phillips offers acupuncture services through his company, North Hills Integrative Medicine Associates.

20.     Defendant Marc Cutler is a member of the Acupuncture Board.  Dr. Cutler is a licensed acupuncturist in Raleigh, North Carolina.  Upon information and belief, he offers acupuncture services through his company, Advanced Healthcare Solutions.

21.     Defendant Vikki Andrews is a resident of Fayetteville, North Carolina. Upon information and belief, she holds a doctorate degree in education.  Dr. Andrews is listed on the Acupuncture Board's website as a member of the Acupuncture Board. However, the Acupuncture Board's website states that her appointment to the Acupuncture Board expired on June 30, 2015.  Insofar as Dr. Andrews continues to serve on the Acupuncture Board, she is the only Acupuncture Board member who is not a licensed acupuncturist.

22.     Dr. Norfleet, Dr. Majebe, Dr. Vaughn, Dr. Phillips, Dr. Cutler, and Dr. Andrews are referred to collectively as "the Acupuncture Board Defendants."

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this action under 15 U.S.C. § 15 and 28 U.S.C. § 1331.

24.     The Court has personal jurisdiction over all Defendants.

25.     Venue in this district is proper under 28 U.S.C. §§ 1391(b)(1) and (c)(2). The Acupuncture Board is deemed to reside in this district because it is subject to the Court's personal jurisdiction in this district with respect to this action.  As described below, the Acupuncture Board took anticompetitive action within this district.  In addition, venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a

substantial portion of the violations and harms complained of occurred and, in the absence of injunctive relief, will continue to occur in this district.

## FACTUAL ALLEGTIONS

### *Physical Therapy and Dry Needling*

26.     Physical therapy is a health care profession within the medical model. Physical therapists are licensed, highly educated, and highly trained health care professionals who use medically tested and evidence-based methods to maintain, restore, and improve their patients' movement, activity, and health.  They are recognized as vital providers of rehabilitation, habilitation, and risk-reduction healthcare services.  They play essential roles in today's health care environment.

27.     Physical therapy is regulated in all 50 states and the District of Columbia. Since 1951, the North Carolina Board of Physical Therapy Examiners has licensed and regulated North Carolina physical therapists.  This licensure requires completion of comprehensive education and training to ensure that all North Carolina physical therapists are competent to safely provide evidence-based and effective physical therapy services.  There are approximately 8,000 licensed physical therapists in North Carolina.

28.     Physical therapists undergo a rigorous and comprehensive educational and training curriculum that allows them to perform various interventions safely.  Accredited physical therapy programs require approximately 2,500 hours of instruction in the areas of anatomy, histology, physiology, biomechanics, kinesiology, neuroscience, pharmacology, pathology, clinical sciences, clinical interventions, clinical applications,

6

and screening. This intensive curriculum ensures that physical therapists become experts in human anatomy and have a detailed understanding of the human musculoskeletal system.

29. One of the many pain issues that physical therapists treat is myofascial trigger point pain. Myofascial trigger point pain is pain arising from one or more hyper-irritable spots in skeletal muscle associated with hypersensitive palpable nodules and taut bands.

30. Physical therapists address the pain and dysfunction associated with these myofascial trigger points in various ways. A commonly used intervention for treating myofascial trigger point pain is intramuscular manual therapy, which is generally referred to as "dry needling."

31. Dry needling is an effective intervention that physical therapists perform safely in North Carolina every day. During dry needling, physical therapists insert needles into trigger points (taut bands in the muscles) to relieve patients' pain or dysfunction.

32. Dry needling has its origins in Western medicine. During the early 1940s, Dr. Janet Travell, an American physician, first explored the use of trigger point injections to therapeutically treat myofascial pain. In the 1970s and 1980s, physical therapists who had studied with Dr. Travell realized the same therapeutic effects could be achieved with the use of dry needles.

7

33.     Physical therapists have been performing dry needling in the United States for more than 30 years.  Physical therapists currently perform dry needling in 32 states, including North Carolina.

34.     The effectiveness of dry needling by physical therapists has been confirmed in multiple studies and comprehensive reviews.  Research has shown that dry needling improves pain control, reduces muscle tension, normalizes dysfunction, and accelerates rehabilitation.  Research has also shown that dry needling, in conjunction with other conventional therapies, relieves pain and improves function better than conventional therapies alone.

35.     According to a recent study by the Human Resources Research Organization, more than four-fifths (86%) of what physical therapists need to know to be competent in dry needling is acquired during the course of their clinical education alone. This includes knowledge related to evaluation, assessment, diagnosis and plan of care development, documentation, safety, and professional responsibilities.

36.     Dry needling is a safe intervention when performed by licensed physical therapists.  The Federation of State Boards of Physical Therapy maintains a database of disciplinary actions against physical therapists.  Upon information and belief, the Federation of State Board's database does not contain a single record of discipline in any jurisdiction for harm caused by dry needling performed by physical therapists.

37.     Many licensed physical therapists in North Carolina, including Dr. Henry and Dr. Schulenklopper, have been performing dry needling in North Carolina for many

years. Neither Dr. Henry nor Dr. Schulenklopper have had a single patient complaint related to their dry needling services.

### *Dry Needling is Within the Scope of Physical Therapy Practice*

38.     Dry needling is within the scope of physical therapy practice.

39.     In North Carolina, the Physical Therapy Board is the only North Carolina state regulatory agency charged with regulating physical therapists who practice physical therapy within their scope of practice.

40.     In December 2010, the Physical Therapy Board expressly determined that dry needling is within the scope of practice of physical therapy in North Carolina.

41.     The Federation of State Boards of Physical Therapy, the American Physical Therapy Association, and the American Academy of Orthopedic Manual Physical Therapists have also expressly stated that dry needling is within the scope of practice of physical therapists.

42.     The use of needles by physical therapists is not a new practice. Physical therapists in North Carolina have safely used needles in performing electromyography ("EMG") tests for more than fifty years. An EMG test records and measures electrical activity of a muscle and is performed by inserting a needle into the muscle. The needles used in EMG tests are similar to the needles used in dry needling, except that the needles used in dry needling generally cause less irritation than do the needles physical therapists currently use when performing EMG tests.

9

43. In April 2011, the Acupuncture Board requested an Advisory Opinion from the North Carolina Attorney General on whether dry needling was within the scope of practice of physical therapy or, alternatively, was a form of acupuncture.

44. In December 2011, the North Carolina Attorney General's Office opined that the Physical Therapy Board had the authority to determine that dry needling is within the scope of practice of physical therapy. The Attorney General's Office further opined that the "authority to use acupuncture needles for therapeutic purposes is not necessarily reserved exclusively to licensed acupuncturists" and that North Carolina's "licensing statutes presume there will be some overlap among the various professions." The Attorney General's Office further opined that "dry needling is . . . distinct from acupuncture."

45. Dry needling is, in fact, distinct from acupuncture. Dry needling is not synonymous with a form of acupuncture known as "Ashi point needling."

### Acupuncture and Ashi Point Needling

46. Acupuncture has its origins in ancient Chinese Daoist philosophy and religion. The central premise of acupuncture is the belief that the workings of the human body are controlled by an energy or life force known as "Qi" (pronounced "chee").

47. Acupuncturists are taught that to achieve optimal health, Qi must flow through certain pathways in the body at the correct strength. These pathways are known as "energy meridians."

10

48.     When acupuncturists detect an imbalance in the flow of an individual's Qi, they insert an acupuncture needle into certain "Ashi points," which are a fixed set of locations mapped out over the human body based on energy meridians. This technique is known as "Ashi point needling." Acupuncturists perform Ashi point needling under the belief that the technique will cause the individual's energy flow to rebalance.

49.     Ashi point needling is often performed while the acupuncturist burns sticks or cones made of herbs such as mugwort. These sticks or cones are known as "moxa sticks" or "moxa cones." This herb burning is done near the skin or, in some instances, directly on the skin. When moxa burning occurs on the skin, it can cause burning and blistering of the skin, as well as intense pain.

50.     Acupuncturists are taught that Ashi point needling can be used to treat a variety of health issues, including tobacco addiction, allergies, depression, and infertility. Acupuncturists are also taught that Ashi point needling can be used to treat neuromusculoskeletal pain or dysfunction.

51.     Neuromusculoskeletal pain or dysfunction are indications for dry needling performed by physical therapists. As a result, acupuncturists in North Carolina—including the acupuncturists who serve on the Acupuncture Board—compete with North Carolina physical therapists who perform dry needling.

*The Relevant Market*

52.     The relevant market in which to evaluate the conduct of the Acupuncture Board is the combined market for dry needling services and Ashi point needling services in North Carolina.

53.     Dry needling by physical therapists is a popular alternative to Ashi point needling for North Carolina consumers.

54.     Some consumers in the relevant market prefer dry needling by physical therapists over Ashi point needling because it is less expensive for them. The actual cost of dry needling by physical therapists is often lower than the actual cost of Ashi point needling. Moreover, a number of health insurers in North Carolina will pay for dry needling by physical therapists but decline to pay for Ashi point needling. The North Carolina State Health Plan—which includes nearly 700,000 North Carolina teachers, state employees and retirees, current and former lawmakers, state university and community college personnel, and their dependents—pays for dry needling by physical therapists but does not pay for Ashi point needling. Thus, for a number of consumers in North Carolina, the out-of-pocket price of dry needling is substantially lower than for Ashi point needling.

55.     In addition, some consumers in the relevant market prefer dry needling by physical therapists over Ashi point needling because it is more convenient for them. Patients who receive dry needling services from physical therapists often seek complementary physical therapy such as exercise, manual therapy, and education. Dry

needling patients can receive these complementary therapies in a single visit with the physical therapist offering the dry needling services. Acupuncturists who offer Ashi point needling cannot offer these complementary physical therapy services.

56. Moreover, some consumers in the relevant market prefer dry needling by physical therapists over Ashi point needling because of their aversion to seek alternative health treatments based in ancient Chinese philosophy and religion.

57. Licensed physical therapists in North Carolina who perform dry needling are an economic threat to acupuncturists in North Carolina who perform Ashi point needling. There are approximately 400 licensed acupuncturists in North Carolina. There are approximately 200 physical therapists in North Carolina who currently offer dry needling.

### The Acupuncture Board

58. Under North Carolina law, the Acupuncture Board is comprised of a supermajority of licensed acupuncturists. Under N.C. Gen. Stat. § 90-453(a), the Acupuncture Board must be comprised of nine members. Seven of those members must be licensed acupuncturists who are active market participants in the relevant market.

59. For some extended period of time leading up to the present, the Acupuncture Board has been comprised of six members—five licensed acupuncturists and Dr. Andrews.

60. Upon information and belief, two additional licensed acupuncturists were recently appointed to the Acupuncture Board. Therefore, if Dr. Andrews' term on the

Board has expired as described above, the Acupuncture Board is comprised of seven members, all of whom are licensed acupuncturists who compete in the relevant market.

61. Under North Carolina law, the Acupuncture Board has jurisdiction to regulate and discipline licensed acupuncturists. N.C. Gen. Stat. § 90-456. The Acupuncture Board's authority with respect to unlicensed persons, however, is more restricted: It may only file a lawsuit to enjoin unlicensed individuals from practicing acupuncture. N.C. Gen. Stat. § 90-454(4). The Acupuncture Board does not have authority to discipline unlicensed individuals or order them to cease and desist from engaging in conduct that the Acupuncture Board believes is within the acupuncture scope-of-practice statute.

62. At all relevant times, the Acupuncture Board's supermajority of active market participants controlled its actions. At all relevant times, this supermajority of active market participants had an incentive to pursue their own self-interests under the guise of implementing state policies.

63. At all relevant times, the Acupuncture Board's actions were not actively supervised by the State of North Carolina. The Acupuncture Board is funded by licensed acupuncturists and acupuncture schools. The Acupuncture Board is represented by private counsel.

64. The Acupuncture Board's anticompetitive acts were not undertaken pursuant to a clearly articulated and affirmatively expressed State policy to displace competition by expelling and deterring physical therapists from the relevant market.

14

## The Acupuncture Board's Anticompetitive Conduct

65.     In recent years, the number of licensed physical therapists in North Carolina who offer dry needling has grown. North Carolina's acupuncturists reacted to that competitive threat by taking action to suppress competition.

66.     Acting through their fellow active market participants on the Acupuncture Board, acupuncturists in North Carolina—and their trade association, the North Carolina Association of Acupuncture and Oriental Medicine—sought to reduce or eliminate competition by using the Acupuncture Board's government power to drive physical therapists from the relevant market.

67.     Beginning in 2010, the Acupuncture Association pressured the Acupuncture Board to use its government power to suppress competition from physical therapists. As the Acupuncture Board's official minutes confirm, the Acupuncture Board agreed to take the specific actions requested by the Acupuncture Association.

68.     The minutes from the Acupuncture Board's June 25, 2010 meeting state that "the topic of dry needling" was "on the agenda" and that "members of the [Acupuncture Association] were against other professions practicing dry needling." The Acupuncture Association offered to "be a resource for this issue" and told the Acupuncture Board that it had "expert witnesses for any hearing and/or can write a letter to the Attorney General."

69.     In response, the Acupuncture Board's attorney "offered to help the [Acupuncture Association]" by "following up on this issue with them." The Acupuncture

15

Board's attorney also reported that there were "various website articles she found during her internet research that make the argument *for* Physical Therapists to use dry needling." (emphasis added). To rebut these articles in support of physical therapists performing dry needling, the Acupuncture Board's attorney "encouraged Board members to write articles to post on the internet discouraging the use of dry needling among other practitioners."

70.     At the Acupuncture Board's next meeting on July 30, 2010, the Acupuncture Board invited the Acupuncture Association's president to give a report on dry needling. The minutes of that meeting state that the Acupuncture Association's president "reported that the Association is attempting to set up a system to communicate with Board members and practitioners should something come up in the legislature that the Board or Association needs to take action upon." The Acupuncture Board suggested an appropriate contact in its office to discuss this new communication system.

71.     At the Acupuncture Board's April 1, 2011 meeting, the Acupuncture Association was invited to give a report on its lobbying efforts related to dry needling. The minutes of that meeting state that "the Association will be going to the General Assembly with [its lobbyist] on April 12, 2011 to meet with legislators." To assist the Acupuncture Association with its lobbying efforts, the Acupuncture Board instructed its attorney to draft "a one page position paper regarding dry needling" and "email it to the Board for its approval."

72.     Following that meeting, a member of the Acupuncture Board sent an April 15, 2011 e-mail to the other members of the Acupuncture Board and its attorney to

16

discuss an "ethics" issue. The e-mail described how the Acupuncture Association's "liaisons . . . can act 'like' lobbyists" before the Acupuncture Board. The e-mail warned that an "outsider" might see the Acupuncture Association's involvement as "furthering the profession['s] position" and "specifically professional turf protection, and hence more properly the province of the Association rather than the Board." The e-mail further stated that "this is an example of how one person's competence argument can look like a further the profession argument." The e-mail ultimately concluded, however, that as long as there was "a public protection argument . . . it seems reasonable . . . for the Board to support [the 'turf protection'] argument."

73.     At the Acupuncture Board's next meeting on April 29, 2011, the Acupuncture Board considered its attorney's draft "position paper" on dry needling. The minutes of that meeting state that the Acupuncture Board's attorney "passed around revised copies of the [Acupuncture Board's] Dry Needling document and the Board made revisions to the document, changing the title to: 'NCALB Defines Dry Needling as Acupuncture.'"

74.     Approximately one year later at the Acupuncture Board's April 27, 2012 meeting, the Acupuncture Association's president was invited to give another report on dry needling. The Acupuncture Association's president told the Acupuncture Board that "[t]he issue of dry needling being defined as acupuncture is still a strong priority of the Association."

75.     At the Acupuncture Board's June 29, 2012 meeting, the Acupuncture Association was again invited to give a report on its "concern regarding physical therapists performing dry needling." In response to the Acupuncture Association's report, a member of the Acupuncture Board "suggested the Board form a committee to begin putting together language in a position statement regarding the [Acupuncture Board's] position on dry needling," which would be "distributed online." Two other members of the Acupuncture Board agreed to serve on this committee. Upon its formation, the committee "asked [the Acupuncture Association's president] to give them some talking points which the Association would like to see the committee address in its statement."

76.     The June 29, 2012 meeting concluded with the Acupuncture Board noting that it "has not had a formal complaint filed with them regarding the practice of dry needling by a physical therapist." The Acupuncture Board assured the Acupuncture Association, however, that "when and if the Board receives a formal complaint, they will act on the complaint."

77.     That same day, a member of the Acupuncture Board e-mailed the other members of the Acupuncture Board, its attorney, and the Acupuncture Association president to let them know he had "done some editing to the Wikipedia page" for "dry needling." His extensive edits to the www.wikipedia.com entry for "dry needling" included adding a statement that "[d]ry needling would appear to be closest to the use of what are called a-shi points in acupuncture." In his e-mail, he noted that other revisions

18

he had made "would benefit from a citation." In response, other members of the Acupuncture Board offered their suggestions.

78. By the time of the Acupuncture Board's September 28, 2012 meeting, the Acupuncture Board was ready to issue its publication on dry needling. The minutes of that meeting state that "[t]he position paper on Dry Needling is now finalized." The minutes further state that "[t]he Board will post the Position Statement on the website and submit to the [Acupuncture Association]. The Statement will be presented to the Association and posted on their website as well."

79. The minutes of that meeting further state that the Acupuncture Board directed that one of its members "will be responsible for amending information on dry needling on www.wikipedia.com."

80. The Acupuncture Board's September 2012 publication was entitled "Dry Needling is Intramuscular Manual Therapy is Acupuncture" ("the Publication"). The Publication set forth the Acupuncture Board's view that it could "define dry needling as the practice of acupuncture." Relying on its new "definition," the Publication further stated that dry needling was the unauthorized practice of acupuncture.

81. The Publication stated that "physical therapists performing dry needling in North Carolina" were:

- engaging in a "misrepresentation of the skill set included in the scope of practice of physical therapists in North Carolina";

- "confus[ing] the public as to who may provide Acupuncture safely";

19

- "undermin[ing] the General Assembly";

- subject to being "legally enforced to discontinue these actions"; and

- "endangering the public."

82.     The Acupuncture Board made the Publication available on its website and disseminated it to third parties.

83.     As reflected in its minutes, the Acupuncture Board also further edited the "dry needling" entry on www.wikipedia.com.   The Acupuncture Board edited the www.wikipedia.com content to state: "The North Carolina Acupuncture Licensing Board has published a position statement asserting that dry needling is acupuncture and thus is covered by the North Carolina Acupuncture Licensing law, and is not within the present scope of practice of Physical Therapists, and Physical Therapists are not among the professions exempt from the law."   The Acupuncture Board also revised the www.wikipedia.com entry to include a link to a PDF file of the Publication.

84.     Acupuncturists in North Carolina shared the Publication with consumers through social media and blogs in an effort to persuade consumers not to seek dry needling services from physical therapists.   For example, the Lotus Center for Oriental Medicine, Acupuncture, and Healing Arts in Greensboro, North Carolina posted the Publication on its blog.   The Lotus Center also posted links to the Publication on Twitter with captions such as: "Check out our latest NC Acupuncture Licensing Board Position Statement on Dry Needling" and "Have you heard about Dry Needling?   Read the NC Licensing Board's position on this."

20

85.    At the Acupuncture Board's next meeting on October 26, 2012, the Acupuncture Board invited its Executive Director to address the issue of dry needling.  In the presence of the Acupuncture Association's president, the Executive Director stated that the Acupuncture Board "would be best served with formal complaints filed with it in order to act more proactively on the issue of non-licensed persons performing dry needling."

86.    On November 12, 2012, the Acupuncture Association wrote a letter to the Acupuncture Board.  The Acupuncture Association's letter:

- "urge[d]" the Acupuncture Board to "more vigorously oppose the practice of dry needling by physical therapists";

- demanded that the Acupuncture Board take several "immediate steps," including "writ[ing] a cease-and-desist letter to every physical therapist performing dry needling";

- suggested that "[a] simple Google search of 'dry needling – physical therapist – North Carolina' will identify most of the practitioners doing so";

- demanded that the Acupuncture Board "write a cease and desist letter to every training enterprise that is erroneously telling physical therapists that they can train in and perform dry needling in North Carolina"; and

- urged the Acupuncture Board to "[d]etermine who the investigator appointed to [the Acupuncture Board] is and focus him/her on this issue."

87.     On December 7, 2012, the Acupuncture Board responded by letter to the Acupuncture Association "to address the Association's requests regarding its recommendations for actions the Board should take."   The Acupuncture Board's letter stated:

- "It's important to remember the [Acupuncture Board] does not have jurisdiction over any other practitioner in this state other than *licensed acupuncturists*." (emphasis in original).

- The applicable "statutes are open to interpretation by other Boards."

- "[T]his question may need to be resolved by legislators."

- The Acupuncture Board "had received a complaint listing twelve physical therapists who were allegedly advertising dry needling on their websites," which the Acupuncture Board promised to "investigate and . . . issue Cease and Desist letters to those who are guilty of advertising dry needling."   A "[carbon copy] will also be sent of each letter to the [Physical Therapy Board]."

- "It is important to note that complaints solely from licensed acupuncturists could be seen as professional protectionism in the eyes of law enforcement or in the eyes of legislators."

88.     The "complaint" targeting twelve physical therapists referenced in the Acupuncture Board's response was filed by Dr. Majebe.   In a November 9, 2012 e-mail

regarding Dr. Majebe's complaint, a member of the Acupuncture Board stated that he "told her to send it and we could then act on it."

89.     Dr. Majebe had previously served as Chair of the Acupuncture Board.  She would soon become a member of the Acupuncture Board again.

90.     The Acupuncture Association was made aware of Dr. Majebe's list, and it pressured the Acupuncture Board to take action against the physical therapists on her list. The minutes of the Acupuncture Board's March 22, 2013 meeting state that the Acupuncture Association demanded the Acupuncture Board "explain why the Cease and Desist letters are [not being sent to] the list of physical therapists advertising dry needling submitted by Cissy Majebe."  The Acupuncture Board responded that it "decided against sending the letter at the time due to the fact that they did not have evidence of practice, nor testimony from a patient complaining about dry needling."

91.     At the Acupuncture Board's next meeting on April 26, 2013, Dr. Majebe appeared in person "to inquire about the status of the Board's investigation regarding the complaint she filed with the [Acupuncture Board] which gave names of physical therapists who were advertising dry needling."  The Acupuncture Board responded that it had "drafted a Cease and Desist letter which the Board is considering sending to the physical therapists in the investigation."

92.     To further encourage the Acupuncture Board to take immediate action against the physical therapists on her list, Dr. Majebe shared that she had been successful in convincing a local hospital to take anticompetitive action against physical therapists.

Dr. Majebe stated "that she has worked with her local hospital to educate them on physical therapists doing dry needling, which has in turn resulted in her local hospital prohibiting physical therapists from doing dry needling." Dr. Majebe "encouraged the Board to also be in communication with local hospitals and hospital systems."

93. The minutes of this April 26, 2013 meeting also indicate that the Acupuncture Board's attorney reported on the Acupuncture Board's legal strategy: that the Acupuncture Board "would like to strengthen its case and argument by receiving a formal complaint regarding proof of practice of dry needling by physical therapists, as well as a formal complaint by a patient who has been injured by dry needling."

94. In response to the Acupuncture Board's solicitation of patient complaints for it to act upon, the Acupuncture Association's president stated that the Acupuncture Association "is currently working on obtaining a patient complaint to the [Acupuncture Board]."

95. By May 2013, however, the Acupuncture Association had been unable to find a patient with a complaint about dry needling. As a result, the only complaint before the Acupuncture Board was the complaint from Dr. Majebe.

96. The Acupuncture Association demanded that the Acupuncture Board move forward with issuing cease-and-desist letters to the physical therapists listed in Dr. Majebe's complaint. The minutes from the Acupuncture Board's May 24, 2013 meeting state that a member of the Board "presented letters to the Board from the [Acupuncture Association's] President and [the Acupuncture Association's] attorney urging the Board

to reconsider sending Cease and Desist letters to individuals practicing dry needling who are not licensed to practice acupuncture." After the Acupuncture Board reviewed the letters from the Acupuncture Association, "the Board decided to move forward with sending Cease and Desist letters to the individuals who are advertising dry needling at their practices."

97. At the Acupuncture Board's next meeting on June 28, 2013, the Acupuncture Board considered "a draft of Cease and Desist letters to go to physical therapists that are advertising dry needling." The Acupuncture Board "discussed changes to the letter," then unanimously approved the cease-and-desist letters as amended.

98. That same month, the members of the Acupuncture Board and the president of the Acupuncture Association also discussed the edits that had been made to the entry for "dry needling" on www.wikipedia.com. The member of the Acupuncture Board responsible for making the edits stated that "[i]t is possible that my references could be challenged as inadequate." The subject of the e-mail was entitled: "Dry needling Wikipedia war (I mean entry)."

99. On or about August 3, 2013, Dr. Majebe became a member of the Acupuncture Board. A few weeks later, the Acupuncture Board issued cease-and-desist letters to the physical therapists listed in her complaint ("the Cease-and-Desist Letters").

100. The Cease-and-Desist Letters were intended to intimidate licensed physical therapists in North Carolina who were providing and advertising for dry needling

25

services.  The Cease-and-Desist Letters were printed on the Acupuncture Board's official state government letterhead.

101.    The Cease-and-Desist Letters:

- ordered the targets to immediately "CEASE AND DESIST" providing dry needling services;

- attached a copy of the Publication;

- stated that by engaging in dry needling, the target may be engaging in illegal billing procedures and could be subject to further action by the North Carolina Department of Insurance; and

- stated that practicing acupuncture without a license was a Class 1 misdemeanor.

102.    None of the targets of the Cease-and-Desist Letters were licensed acupuncturists.  The targets of the Cease-and-Desist Letters were all physical therapists.

103.    The Acupuncture Board issued the Cease-and-Desist Letters despite the fact that the U.S. Court of Appeals for the Fourth Circuit had issued a decision a few months earlier holding that identical conduct by the North Carolina Board of Dental Examiners violated the federal antitrust laws.

104.    Dr. Henry received the Cease-and-Desist Letter at her practice in Wilmington.  Dr. Schulenklopper received the Cease-and-Desist Letter at his practice in Greensboro.

26

105. Notwithstanding the Acupuncture Board's earlier statement to the Acupuncture Association that it would copy the Physical Therapy Board on any Cease-and-Desist Letters, the Acupuncture Board did not copy the Physical Therapy Board on any of the Cease-and-Desist Letters.

106. The Cease-and-Desist Letters were also intended to—and did—deter licensed physical therapists in North Carolina who intended to enter the relevant market. Many licensed physical therapists in North Carolina who were not currently offering dry needling services became aware of the Cease-and-Desist Letters. Those who became aware of the Cease-and-Desist Letters included licensed physical therapists who intended to enter the relevant market and were prepared to enter the relevant market, including Ms. Carter and Dr. Jones. These licensed physical therapists, including Ms. Carter and Dr. Jones, were deterred by the Cease-and-Desist Letters from entering the relevant market because they did not want to subject themselves to "unauthorized practice" allegations by the Acupuncture Board or the costs of defending against allegations of that kind.

107. More than a year after it issued the Cease-and-Desist Letters, the Acupuncture Board on December 5, 2014 revised and republished the Publication on its website. Upon information and belief, the Acupuncture Board also disseminated it again to third parties. This time, however, the Acupuncture Board revised its earlier statement that physical therapists offering dry needling were "endangering the public," replacing that language with the statement that they "may pose a threat to public safety."

108.    On January 8, 2015, Dr. Majebe e-mailed a number of her contacts and solicited them to call CBS headquarters in New York about a television program featuring a physical therapist performing dry needling.  Upon information and belief, Dr. Majebe was seeking to manufacture the appearance of a growing "public safety" concern over dry needling.  Dr. Majebe provided a "template of what you can say" and told the recipients of the e-mail to "feel free to use this exactly."  The "template" included the threat that "airing the program will lead to countless complaints filed with the FCC."  Dr. Majebe asked all of the recipients of her e-mail to "please send an email to me so that we can track how many phone calls are going out of North Carolina."

109.    Dr. Majebe's e-mail was forwarded by multiple acupuncturists in North Carolina, including Samuel Townsend, who posted Dr. Majebe's e-mail on a public online forum entitled "Daoistshengshen."  In posting Dr. Majebe's e-mail, Mr. Townsend stated: "I had originally leaned toward the notion that if [physical therapists] are helping patients, then there is no harm, but the more I have thought about dry needling, the more I have come to believe that it undermines our profession."  Mr. Townsend further stated: "If our potential patients believe that dry needling is the same as what we offer, why would they come to us when insurance will cover dry needling?"  Mr. Townsend further stated that dry needling was "taking business away from us."

110.    Around that same time in January 2015, the Acupuncture Association was actively raising money to fund efforts to exclude physical therapists from providing dry needling.  On January 7, 2015, the Acupuncture Association e-mailed all of its

acupuncturist members with an e-mail entitled "Your profession needs you." The e-mail stated as follows:

> We heard you loud and clear! At meetings held in chapters across our state during November and December, you told us what you wanted. The resounding and unanimous response heard from a record number of attendees was clear: stop dry needling.

> Charged with that mandate we are prepared to mount a vigorous defense of our profession and to protect our patients from untrained practitioners who are performing acupuncture (in spite of what they may euphemistically call it). To succeed, we need funding.

> NOW IS THE TIME to support your profession! Let's put our money where our proverbial mouth is! Everything we plan to do to combat the encroachment of dry needling on our practice costs money.

> Act now! Don't wait until it's too late and dry needling becomes accepted. To fund this battle we must raise $25,000 immediately.

111. In response to the Acupuncture Association's directive to "combat the encroachment of dry needling on our practice," the Acupuncture Board on September 2, 2015 filed an objectively baseless verified complaint against the Physical Therapy Board in Wake County Superior Court ("the Lawsuit"). Dr. Norfleet executed the verification for the Lawsuit.

112. The Lawsuit seeks a declaration that dry needling by licensed physical therapists constitutes the unlawful practice of acupuncture. The Lawsuit requests a permanent injunction requiring the Physical Therapy Board to advise its licensees that dry needling is not within the scope of physical therapy practice. More than two years after the Acupuncture Board had issued the Cease-and-Desist Letters, the Lawsuit also

seeks "a judgment authorizing the Acupuncture Board to notify physical therapists not licensed to practice acupuncture in North Carolina to cease and desist from doing so."

113.    The Acupuncture Board filed the Lawsuit even though no reasonable litigant could realistically expect success on the merits.

114.    The Lawsuit is objectively baseless because it is subject to summary dismissal on at least two independent grounds:

(a)    First, the doctrine of sovereign immunity bars the Acupuncture Board's claims in the Lawsuit.   The Physical Therapy Board is entitled to sovereign immunity in the absence of a waiver.   The Physical Therapy Board has not waived its sovereign immunity; indeed, the complaint in the Lawsuit does not even allege such a waiver.   Therefore, all of the Acupuncture Board's claims fail for lack of personal jurisdiction and subject-matter jurisdiction.   No reasonable litigant would fail to recognize that the Lawsuit would be dismissed on these grounds.

(b)    Second, the doctrine of non-exhaustion also bars the Acupuncture Board's claims in the Lawsuit.  The Acupuncture Board brought the Lawsuit prior to exhausting its administrative remedies.  It is settled law in North Carolina that a party seeking a declaratory judgment regarding an agency's interpretation of its own scope-of-practice statute must first petition the agency for a declaratory ruling under N.C. Gen. Stat. § 150B-4.  The Acupuncture Board failed to petition the Physical Therapy Board for a declaratory ruling prior to filing the Lawsuit.

Therefore, all of the Acupuncture Board's claims fail for subject-matter jurisdiction. No reasonable litigant would fail to recognize that the Lawsuit would also be dismissed on these grounds.

115. The Lawsuit is subjectively baseless because it was filed in bad faith and for an improper purpose. The Lawsuit was filed to further the financial interests of the members of the Acupuncture Board as part of their ongoing course of conduct to suppress competition. The Lawsuit was also filed to appease the Acupuncture Association, which had been conspiring with the Acupuncture Board for years, as described above. Immediately after the Lawsuit was filed, the Acupuncture Association posted the complaint in the Lawsuit on its website and solicited funds "to assist in this important cause." Upon information and belief, the Acupuncture Association intends to fund some or all of the Lawsuit.

116. The Acupuncture Board has demonstrated that its anticompetitive conduct has no bounds. In the absence of injunctive relief, the Acupuncture Board will succeed in completely expelling and deterring physical therapists from the relevant market.

### Harm to Active Competitor Plaintiffs

117. Dr. Henry and Dr. Schulenklopper currently perform dry needling services in North Carolina. Dr. Henry and Dr. Schulenklopper actively compete with acupuncturists—including the members of the Acupuncture Board—in the relevant market.

31

118.    Dr. Henry and Dr. Schulenklopper earn a living, in part, by providing dry needling services to their patients.  Although the cost of their dry needling services is modest, they earn substantial revenue (in the aggregate) from providing dry needling services to their patients.

119.    Dr. Henry and Dr. Schulenklopper are entitled to actual damages, including lost profits, proximately caused by the Acupuncture Board's anticompetitive acts.  Upon information and belief, the Acupuncture Board's anticompetitive acts have deterred North Carolina consumers within the relevant market from seeking dry needling services from Dr. Henry and Dr. Schulenklopper.  Dr. Henry and Dr. Schulenklopper are entitled to three times these lost profits as damages in an amount to be proven at trial.

120.    Dr. Henry and Dr. Schulenklopper are also entitled to injunctive relief.  In the absence of injunctive relief, the Acupuncture Board will continue its anticompetitive efforts to expel Dr. Henry and Dr. Schulenklopper from the relevant market.

### Harm to Non-Entrant Competitor Plaintiffs

121.    Since at least 2014, Ms. Carter and Dr. Jones have strongly desired to enter the relevant market as providers of dry needling services.  However, the Acupuncture Board's anticompetitive acts described above have deterred Ms. Carter and Dr. Jones from entering the relevant market.

122.    The Acupuncture Board has caused Ms. Carter and Dr. Jones to fear that if they or their respective physical therapy practices enter the relevant market, the

32

Acupuncture Board will initiate "unauthorized practice" proceedings against them as set forth in the Cease-and-Desist Letters.

123.  Ms. Carter and Dr. Jones intend to enter the relevant market and would have entered the relevant market but for their objectively reasonable fear that the Acupuncture Board would take action against them.  Ms. Carter and Dr. Jones were—and are—prepared to enter the relevant market.

124.  Ms. Carter has made arrangements to complete a certified course in dry needling so that if the Acupuncture Board ceases its anticompetitive acts, Ms. Carter and her practice can begin offering dry needling services.

125.  Dr. Jones permitted one of the physical therapists on his staff, Dr. Polly Martin, to take a certified course in dry needling so that if the Acupuncture Board ceases its anticompetitive acts, Dr. Jones' practice can begin offering dry needling services.  Dr. Martin is fully certified.  Dr. Jones' practice is prepared to offer dry needling services.

126.   Ms. Carter and Dr. Jones are entitled to injunctive relief.  Ms. Carter and Dr. Jones currently intend to enter the relevant market and are prepared to enter the relevant market but for their objectively reasonable fear that the Acupuncture Board will take action against them.   In the absence of injunctive relief, Ms. Carter and Dr. Jones will continue to be deprived of substantial profits they would be earning by offering dry needling to their patients and potential patients.

127.  Ms. Carter and Dr. Jones are also entitled to damages, including lost profits, proximately caused by the Acupuncture Board's anticompetitive conduct.  Ms. Carter and

Dr. Jones would have earned substantial profits if they and their respective practices had been able to enter the relevant market without fear that the Acupuncture Board would take action against them. Ms. Carter and Dr. Jones are entitled to three times these lost profits in an amount to be proven at trial.

### *Harm to Consumer Plaintiffs*

128. Ms. Burkhard-Catlin and Ms. Purrington are patients of Dr. Henry. Dr. Henry has performed dry needling on each of them numerous times.

129. Ms. Burkhard-Catlin and Ms. Purrington are professional ballet dancers.

130. Their intense training and ballet performances put great physical demands on their bodies. Ms. Burkhard-Catlin and Ms. Purrington perform approximately 80 shows each year. They perform and rehearse on hard stages, which cause great stress on their bodies. Additionally, Ms. Burkhard-Catlin and Ms. Purrington consistently push their bodies to their physical limits, with demanding performance and training schedules, hours of intense physical training, and movements that would be difficult—if not impossible—for most professional athletes.

131. Ms. Burkhard-Catlin's and Ms. Purrington's physical health and well-being are critical to their ability to continue their employment as professional ballet dancers. Dry needling directly contributes to their professional success.

132. Ms. Burkhard-Catlin and Ms. Purrington each currently receive dry needling—either from Dr. Henry or another physical therapist—approximately every two weeks. The dry needling they receive is critical for them because it targets the specific

muscles experiencing pain, tension, or spasms. The relief Ms. Burkhard-Catlin and Ms. Purrington experience from dry needling is more immediate and effective than other treatments such as massage.

133. Ms. Burkhard-Catlin has received acupuncture on numerous occasions in the past. She sought acupuncture to relax, but she did not seek acupuncture to relieve specific muscle pain or spasms.

134. In the fall of 2014, Ms. Purrington sought acupuncture to assist in the healing process from a ligament injury. Ms. Purrington experienced no immediate relief from acupuncture. She is uncertain whether the acupuncture helped her heal. Her injury eventually resolved on its own approximately six months later.

135. For treatment of pain or dysfunction, Ms. Burkhard-Catlin and Ms. Purrington prefer dry needling by physical therapists over Ashi point needling. This is due to the differences between dry needling performed by physical therapists versus Ashi point needling.

136. In the absence of injunctive relief, the Acupuncture Board's anticompetitive acts will exclude and deter physical therapists from the relevant market. This will deprive Ms. Burkhard-Catlin and Ms. Purrington of the benefits of consumer choice and price competition in the relevant market.

## <u>COUNT 1</u>

### **15 U.S.C. § 1: Violation of Section 1 of the Sherman Act**

137.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

138.    Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade."  15 U.S.C. § 1.

139.    At all relevant times, the members of the Acupuncture Board—acting through the Acupuncture Board—had market power in the form of coercive government power.

140.    At all relevant times, the members of the Acupuncture Board had the capacity to conspire in violation of Section 1 of the Sherman Act.  The acupuncturist members of the Acupuncture Board competed against each other in the relevant market, competed against other acupuncturists in the relevant market, and competed against physical therapists performing dry needling in the relevant market.  These acupuncturist members of the Acupuncture Board continued to operate separate acupuncture practices while serving on the Acupuncture Board.  They had a personal financial interest in expelling and deterring physical therapists from the relevant market because, upon information and belief, they offered Ashi point needling and other acupuncture services as part of their acupuncture practices.  In their private practices, they remained separately controlled, potential competitors.

141.   Acting through the Acupuncture Board, the members of the Acupuncture Board reached an anticompetitive agreement to expel and deter a popular horizontal competitor.  As described above, the members of the Acupuncture Board agreed to:

(a)   take the specific anticompetitive actions requested by the Acupuncture Association;

(b)   prepare the Publication, post it on the Acupuncture Board website, and disseminate it to third parties in 2012;

(c)   edit the "dry needling" entry on www.wikipedia.com;

(d)   solicit complaints about physical therapists, then act on those complaints;

(e)   issue the Cease-and-Desist Letters;

(f)   revise the Publication, post it on the Acupuncture Board website, and disseminate it to third parties in 2014; and

(g)   file the Lawsuit.

142.   The members of the Acupuncture Board had a conscious commitment to a common scheme designed to achieve their unlawful objectives.  As confirmed by the Acupuncture Board's minutes, which were all unanimously approved, the members of the Acupuncture Board reached an explicit agreement to engage in the anticompetitive conduct described above.  The minutes of the Acupuncture Board confirm its members' unanimous support for these acts.  In the alternative, the members of the Acupuncture Board—at a minimum—acquiesced in the agreement to engage in such conduct.

143. The agreement between the members of the Acupuncture Board had actual anticompetitive effects and, in absence of injunctive relief, will continue to have actual anticompetitive effects. As described above, these anticompetitive effects include:

(a) the exclusion of active competitors from the relevant market;

(b) the exclusion of non-entrant competitors from the relevant market;

(c) causing active competitors to suffer lost profits;

(d) causing non-entrant competitors to suffer lost profits; and

(e) depriving consumers of the benefits of price competition and consumer choice in the relevant market.

144. The agreement reached by the members of the Acupuncture Board has no pro-competitive features. It is not justified by any efficiencies or other economic benefits sufficient to justify its harmful effect on competition.

145. The anticompetitive conduct described above constitutes a *per se* unreasonable restraint of trade. In the alternative, the anticompetitive conduct described above constitutes an unreasonable restraint of trade under a quick-look analysis. In the alternative, the anticompetitive conduct described above constitutes an unreasonable restraint of trade under the rule of reason.

146. As described above, Plaintiffs have suffered injury-in-fact and, in the absence of injunctive relief, will continue to suffer injury-in-fact. As described above, Dr. Henry, Dr. Schulenklopper, Ms. Carter, and Dr. Jones have all suffered economic loss and, in the absence of injunctive relief, will continue to suffer economic loss. As

described above, in the absence of injunctive relief, Ms. Burkhard-Catlin and Ms. Purrington will be deprived of the benefits of consumer choice and price competition in the relevant market.

147.    Plaintiffs are entitled to three times their actual damages, prejudgment interest, injunctive relief, the costs of this action, and attorneys' fees against Defendants under 15 U.S.C. § 15.

## COUNT 2

### 42 U.S.C. § 1983: Violation of Substantive Due Process

148.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

149.    42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute . . . regulation . . . [or] custom . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

150.    At all relevant times, the Acupuncture Board Defendants exercised—and continue to exercise—coercive government power that is available to them only because they are members of the Acupuncture Board.  Therefore, for purposes of 42 U.S.C. § 1983, the Acupuncture Board Defendants acted under color of state law.

151.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

152.    Dr. Henry, Dr. Schulenklopper, Ms. Carter, and Dr. Jones have a liberty interest and a property interest in pursuing their right to earn a living in their current professions.  Each of them has a license in good standing from the Physical Therapy Board to practice physical therapy.

153.    The Acupuncture Board Defendants' past and continuing efforts to expel and deter physical therapists from the relevant market is arbitrary and capricious and not rationally related to a legitimate government interest.

154.    As described more fully above, the Acupuncture Board Defendants' actual motivation for their anticompetitive conduct is economic protectionism.  Economic protectionism is not a legitimate government interest.

155.    The Acupuncture Board Defendants cannot justify their anticompetitive conduct with after-the-fact justifications of health or public safety.  When performed by licensed physical therapists, dry needling is sufficiently safe that there is no legitimate government interest in requiring physical therapists to complete the requirements for an acupuncture license—including a three-year postgraduate program—under N.C. Gen. Stat. § 90-455.

156.    Any such after-the-fact health or public safety justifications are even more irrational given that the Physical Therapy Board already regulates physical therapists who

perform dry needling. The Physical Therapy Board has determined that dry needling is within the scope of practice of physical therapy. Therefore, the Physical Therapy Board is required by law to take action against physical therapists who perform dry needling in a manner that "could result in harm or injury to the public." N.C. Gen. Stat. § 90-270.36(9). Particularly given the safety and efficacy of dry needling performed by physical therapists, there is no legitimate government interest in "double regulation" by both the Physical Therapy Board and the Acupuncture Board. Duplicative regulation of a safe intervention by two occupational licensing boards is not rationally related to a legitimate government interest.

157.    In addition, it would be irrational to require physical therapists to satisfy the prerequisites for an acupuncture license before they can perform dry needling. The three years of postgraduate acupuncture education and additional acupuncture training required for an acupuncture license would not instruct physical therapists about dry needling; at most, it would only instruct physical therapists about Ashi point needling. Dr. Henry, Dr. Schulenklopper, Ms. Carter, and Dr. Jones have no interest in performing Ashi point needling; they only want to perform dry needling. Likewise, acupuncture education covers a broad range of topics that are irrelevant to dry needling—for example, the practice of burning mugwort described above. For these reasons, requiring physical therapists to satisfy the prerequisites for an acupuncture license before they offer dry needling services is arbitrary and capricious and not rationally related to a legitimate government interest.

158.   In the absence of permanent injunctive relief, there is a real and immediate threat that the Acupuncture Board Defendants will initiate "unauthorized practice" proceedings against Dr. Henry, Dr. Schulenklopper, Ms. Carter, and Dr. Jones as set forth in the Cease-and-Desist Letters.  In the absence of permanent injunctive relief, Dr. Henry, Dr. Schulenklopper, Ms. Carter, and Dr. Jones will be unable to earn a living by performing dry needling unless they subject themselves to the substantial burden of obtaining a license to practice acupuncture.

159.   The violation of Dr. Henry's, Dr. Schulenklopper's, Ms. Carter's, and Dr. Jones' substantive due process rights constitutes *per se* irreparable harm.

160.   Dr. Henry, Dr. Schulenklopper, Ms. Carter, and Dr. Jones are entitled to prospective injunctive relief against the Acupuncture Board Defendants in their official capacities to enjoin their continuing unconstitutional actions under the Fourteenth Amendment.

## DEMAND FOR JURY TRIAL

161.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(1)     enter a permanent injunction prohibiting Defendants from continuing their illegal and anticompetitive actions in violation of 15 U.S.C. § 1;

Case 1:15-cv-00831-CCE-LPA   Document 1   Filed 10/07/15   Page 42 of 44

(2)     award Plaintiffs treble damages and prejudgment interest from Defendants pursuant to 15 U.S.C. § 15;

(3)     award Plaintiffs the costs of this action and attorneys' fees against Defendants pursuant to 15 U.S.C. § 15;

(4)     enter a permanent injunction enjoining the Acupuncture Board Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them from violating Plaintiffs' rights under the Fourteenth Amendment;

(5)     award Plaintiffs their costs of bringing this action, including their attorneys' fees, against the Acupuncture Board Defendants in their official capacities under 42 U.S.C. § 1988; and

(6)     grant such further relief as appears to this Court to be equitable and just.

Respectfully submitted the 7th day of October, 2015.

POYNER SPRUILL LLP


By:   s/ Andrew H. Erteschik
      Andrew H. Erteschik
      N.C. State Bar No. 35269
      aerteschik@poynerspruill.com
      P.O. Box 1801
      Raleigh, NC  27602-1801
      Telephone: 919.783.2895
      Facsimile:  919.783.1075


By:   s/ Caroline P. Mackie
      Caroline P. Mackie
      N.C. State Bar No. 41512
      cmackie@poynerspruill.com
      P.O. Box 1801
      Raleigh, NC  27602-1801
      Telephone: 919.783.6400
      Facsimile:  919.783.1075


By:   s/ John Michael Durnovich
      John Michael Durnovich
      N.C. State Bar No. 47715
      jdurnovich@poynerspruill.com
      301 South College Street, Suite 2300
      Charlotte, NC 28202
      Telephone: 704.342.5344
      Facsimile: 704.342.5264

      COUNSEL FOR PLAINTIFFS