IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


ELIZABETH HENRY, et al.,       )
                               )
                               )
              Plaintiffs,      )
                               )
     v.                        )          1:15CV831
                               )
NORTH CAROLINA ACUPUNCTURE     )
LICENSING BOARD, et al.,       )
                               )
              Defendants.      )


### MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

    This matter comes before the court on three motions — one
by Plaintiffs and two by Defendants. Defendants move for a stay
pending state court resolution of a related case (Doc. 20) and
move to dismiss the Amended Complaint (Doc. 22). Plaintiffs move
for leave to file a surreply to Defendants' motion to dismiss
(Doc. 33). The motions have been fully briefed and are now ripe
for adjudication. For the reasons that follow, Defendants'
motion to stay the proceedings will be denied, Defendants'
motion to dismiss will be granted in part and denied in part,
and Plaintiffs' motion for leave to file a surreply will be
denied.

I.    **FACTS AND PROCEDURAL HISTORY**

The following facts are drawn from the Amended Complaint, (Amended Complaint ("Am. Compl.") (Doc. 19)), and are presented in the light most favorable to Plaintiffs. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A.    **The Parties**

The parties bringing the present lawsuit (referred to throughout as "Plaintiffs") are as follows: Dr. Elizabeth Henry and Dr. Aart Schulenklopper are licensed physical therapists who currently perform a practice called "dry needling" for their patients. (Am. Compl. (Doc. 19) ¶¶ 7, 37.) Dr. Eileen Carter and Dr. Shondell Jones "are physical therapists who want to [perform dry needling] but are afraid to do so." (Id. at 7.) Finally, "Jan Burkhard-Catlin and Lindsay Purrington are professional ballet dancers whose job performance depends on [dry needling] . . . ." (Id.)

The primary Defendant in this case is the North Carolina Acupuncture Licensing Board ("the Acupuncture Board"), which is the "state agency charged with regulating the practice of acupuncture." (Id. ¶ 15.) The Amended Complaint further names Emmylou Norfleet, M. Cissy Majebe, Karen Vaughn, Chester

- 2 -

Phillips, and Marc Cutler as Defendants, all of whom are members or directors of the Acupuncture Board and all of whom practice acupuncture. (Id. ¶¶ 16-20.) The Amended Complaint also names Vikki Andrews as a Defendant. Dr. Andrews is a member of the Acupuncture Board but is not a licensed acupuncturist. (Id. ¶ 21.) The court refers to the above-mentioned parties (collectively) throughout as the "Acupuncture Board Defendants."

**B.    Background**

According to Plaintiffs, dry needling is "[a] commonly used intervention for treating myofascial trigger point pain," during which "physical therapists insert needles into trigger points (taut bands in the muscles) to relieve patients' pain or dysfunction." (Am. Compl. (Doc. 19) ¶¶ 30-31.) Plaintiffs allege that dry needling is effective for a number of medical purposes and that physical therapists in North Carolina have performed dry needling safely for decades. (Id. ¶¶ 33-37.) The North Carolina Physical Therapy Board ("Physical Therapy Board") "is the only North Carolina state regulatory agency charged with regulating physical therapists" and in December of 2010, "expressly determined that dry needling is within the scope of [the] practice of physical therapy in North Carolina. (Id. ¶¶ 39-40.)

- 3 -

In contrast, Plaintiffs allege that "[a]cupuncture has its origins in ancient Chinese Daoist philosophy and religion." (Id. ¶ 46.) Plaintiffs alleges that acupuncturists base their practice on the flow of "Qi" throughout a patient's body, which practitioners manipulate by inserting needles at "Ashi points," which are based on "energy meridians" in the hope "that the technique will cause the individual's energy flow to rebalance." (Id. ¶¶ 47-48.) Because acupuncture purports to address the same pain as dry needling, "acupuncturists in North Carolina - including the acupuncturists who serve on the Acupuncture Board - compete with North Carolina physical therapists who perform dry needling." (Id. ¶ 51.)

"In April 2011, the Acupuncture Board requested an Advisory Opinion from the North Carolina Attorney General on whether dry needling was within the scope of [the] practice of physical therapy or, alternatively, was a form of acupuncture." (Id. ¶ 43.) "In December 2011, the North Carolina Attorney General's Office opined that the Physical Therapy Board had the authority to determine that dry needling is within the scope of practice of physical therapy." (Id. ¶ 44.)

Pivotally, "[s]ome consumers in the relevant market prefer dry needling by physical therapists over Ashi point needling"

- 4 -

for a number of reasons, including the fact that some insurance plans cover dry needling while none cover acupuncture. (Id. ¶¶ 54-56.) As a result, Plaintiffs allege that "[i]n recent years, the number of licensed physical therapists in North Carolina who offer dry needling has grown," inspiring Defendants' anticompetitive and unconstitutional conduct. (Id. ¶ 5.)

    **C.**   <u>**Challenged Conduct**</u>

The North Carolina Association of Acupuncture and Oriental Medicine ("Acupuncture Association") is the trade association to which acupuncturists practicing in North Carolina belong, including Defendants. (Id. ¶ 66.) "Beginning in 2010, the Acupuncture Association pressured the Acupuncture Board to use its governmental power to suppress competition from physical therapists." (Id. ¶ 67.)

On June 29, 2012, the Acupuncture Board and the Acupuncture Association formed a committee to create a "position statement" regarding the Acupuncture Board's tentative stance on dry needling which would be "distributed online." (Id. ¶ 75.) At the same meeting, the Acupuncture Board noted that it "[had] not received a formal complaint . . . regarding the practice of dry needling by a physical therapist." (Id. ¶ 76.)

- 5 -

Around this same time, Acupuncture Board members began editing the Wikipedia page for "dry needling" to reflect their contention that dry needling is a form of acupuncture. (Id. ¶ 77.) The Acupuncture Board would later instruct one of its members to continue editing the "dry needling" Wikipedia page in accordance with their goals. (Id. ¶ 80.)

In or around September, 2012, the Acupuncture Board posted its publication entitled "Dry Needling is Intramuscular Manual Therapy is Acupuncture" ("the Publication") on its website, on various social media platforms and on other relevant websites or blogs under the control of its members. (Id. ¶¶ 81-85.) The Acupuncture Board also edited the "dry needling" Wikipedia page to reflect the Acupuncture Board's conclusion and to include a link to the Publication. (Id. ¶ 84.)

The Publication, after concluding that dry needling is acupuncture, continued that "physical therapists performing dry needling in North Carolina" were:

- engaging in a misrepresentation of the skill set included in the scope of practice of physical therapists in North Carolina;

- confusing the public as to who may provide Acupuncture safely;

- undermining the General Assembly;

- subject to being legally enforced to discontinue these actions; and

- endangering the public.

(Id. ¶ 82) (internal quotation marks omitted).

From October of 2012 to August of 2013, the Acupuncture Association and the Acupuncture Board experienced a number of disagreements regarding the appropriate manner of handling "those who are guilty of dry needling." (Id. ¶¶ 87-103.) The Acupuncture Association persistently pressed the Acupuncture Board to take more "vigorous" action, while the Acupuncture Board stressed the fact that it only had jurisdiction over "licensed acupuncturists" as well as the need for justification outside "professional protectionism," citing the lack of complaints from anyone other than licensed acupuncturists. (Id. ¶¶ 88-89.) Without patient complaints, the Acupuncture Board ultimately acceded to the Acupuncture Association's demands that it move forward with the cease-and-desist letters. (Id. ¶¶ 90-98.) The Acupuncture Association's Executive Director, displeased with the delay in sending the cease-and-desist letters, had two of the Acupuncture Board's members replaced. (Id. ¶¶ 99-100.) In a June 17, 2013 email, one of the outgoing board members made reference to the Acupuncture Association's

- 7 -

"professional protectionist position and turf war agenda." (Id. ¶ 100.)

Around August of 2013, the Acupuncture Board sent cease-and-desist letters ("the Letters") to a number of physical therapists who advertised dry needling. (Id. ¶ 104.) The Letters:

- ordered the targets to immediately "CEASE AND DESIST" providing dry needling services;

- attached a copy of the Publication

- stated that by engaging in dry needling, the target may be engaging in illegal billing procedures and could be subject to further action by the North Carolina Department of Insurance; and

- stated that practicing acupuncture without a license was a Class 1 misdemeanor.

(Id. ¶ 106.) Dr. Henry and Dr. Schulenklopper were among the physical therapists to receive the Letters at their offices. (Id. ¶ 109.) Dr. Carter and Dr. Jones, who had plans to enter the relevant market, heard about the Letters and decided not to enter the market "because they did not want to subject themselves to 'unauthorized practice' allegations by the Acupuncture Board or the costs of defending against allegations of that kind." (Id. ¶ 111.)

On December 5, 2014, the Acupuncture Board "revised and republished the Publication on its website. . . . [A]nd . . . disseminated it again to third parties." (Id. ¶ 112.) Further, on January 8, 2015, "Dr. Majebe e-mailed a number of her contacts and solicited them to call CBS headquarters in New York about a television program featuring a physical therapist performing dry needling." (Id. ¶ 113.) "On January 7, 2015, the Acupuncture Association e-mailed all of its acupuncturist members" in an attempt to raise $25,000 for the stated goal of "[stopping] dry needling." (Id. ¶ 115.)

On September 2, 2015, the Acupuncture Board filed a "verified complaint against the Physical Therapy Board in Wake County Superior Court ('the [State] Lawsuit')." (Id. ¶ 116.) The State Lawsuit seeks a "declaration that dry needling by licensed physical therapists constitutes the unlawful practice of acupuncture," a "permanent injunction requiring the Physical Therapy Board to advise its licensees that dry needling is not within the scope of physical therapy practice" and "a judgment authorizing the Acupuncture Board to notify physical therapists not licensed to practice acupuncture in North Carolina to cease and desist from doing so." (Id. ¶ 117.) The Acupuncture Board later amended the State Lawsuit to name Dr. Henry and Dr.

- 9 -

Schulenklopper, seeking a permanent injunction against them. (Id. ¶ 124.) Plaintiffs allege that, for reasons of sovereign immunity and nonexhaustion, the State Lawsuit is "in bad faith and for an improper purpose." (Id. ¶ 127.)

D.    **The Relevant Market**

Plaintiffs allege that "[t]he relevant market in which to evaluate the conduct of the Acupuncture Board is the combined market for dry needling services and Ashi point needling services in North Carolina."[1] (Id. ¶ 52.) Specifically, "[t]here are approximately 500 licensed acupuncturists in North Carolina" and "approximately 200 physical therapists in North Carolina who currently offer dry needling." (Id. ¶ 57.)

---

[1] The strictly intrastate nature of the alleged relevant market poses no issue concerning the Sherman Act's interstate jurisdictional requirement, as "[Plaintiffs] need not make the more particularized showing of an effect on interstate commerce caused by the alleged[ly anticompetitive activity of Defendants]." McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 242-43 (1980); Shahawy v. Harrison, 778 F.2d 636, 640 (11th Cir. 1985), amended, 790 F.2d 75 (11th Cir. 1986) ("In other words, an elaborate analysis of interstate impact is not necessary at the jurisdictional stage, only an allegation showing a logical connection as a matter of practical economics between the unlawful conduct and interstate commerce.").

### E.    Relief Sought

Plaintiffs assert two causes of action, designated in the Amended Complaint as Counts. Count 1 alleges a violation of Section 1 of the Sherman Act, under 15 U.S.C. § 1. (Am. Compl. (Doc. 19) at 44.) Count 2 alleges a violation of Substantive Due Process under 42 U.S.C. § 1983. (Id. at 52.)

As remedies, Plaintiffs seek "a permanent injunction prohibiting Defendants from continuing their illegal and anticompetitive actions," "treble damages and prejudgment interest," costs and attorneys' fees. (Id. ¶ 195.)

## II.  PLAINTIFFS' MOTION FOR LEAVE TO FILE SURREPLY

Plaintiffs filed the Amended Complaint on February 3, 2016 (Doc. 19), and Defendants moved to dismiss on March 7, 2016 (Doc. 22). Plaintiffs responded on April 21, 2016 (Doc. 28) and Defendants replied on May 27, 2016 (Doc. 32). Plaintiffs then moved for leave to file a surreply (Doc. 33) in order to address "new arguments that were not raised in Defendants' initial brief or Plaintiffs' response brief," alleging that such new arguments violated Local Rule 7.3(h). (Doc. 34 at 1.) Defendants responded (Doc. 35), and Plaintiffs again replied (Doc. 36).

In the motion to file a surreply, Plaintiffs challenge Defendants' reply, alleging that "Defendants argue for the first

- 11 -

time that the amended complaint fails to define a relevant market under federal antitrust law" and that "Defendants argue for the first time that the amended complaint fails to allege market power." (Doc. 34 at 3.) Because "Plaintiffs have not had the opportunity to rebut," they "seek leave to file a surreply to address Defendants' new market-definition argument and market-power argument." (Id. at 2-3.) "Alternatively, Plaintiffs ask that the Court disregard these new arguments when it decides the motions to dismiss." (Id. at 3.)

In response, Defendants allege that, because "Plaintiffs' Response raised the issue of threatened injury[,] . . . it is entirely appropriate for Defendants' Reply to address the issue of threatened injury, which includes an analysis of the relevant market and market power . . . ." (Doc. 35 at 3.)

Pursuant to the Local Rules for Civil Practice for this district, "[a] reply brief is limited to discussion of matters newly raised in the response." LR7.3(h) (emphasis added). Plaintiffs' response is not the first pleading to allege "threatened injury," as the Amended Complaint references the topic in three different subheadings. (Am. Compl. (Doc. 19) at 36, 38, 41.) As such, any new arguments as to market power or definition of the relevant market were not properly raised in

- 12 -

Defendants' reply because Defendants were "on notice" as to the "threatened injury" component of Plaintiffs' claim upon their receipt of the Amended Complaint. Simply put, Plaintiffs' allegations of "threatened injury" were not "newly raised in the response." As such, Defendants should not have posed new arguments seeking dismissal, for the first time in their reply, on the ground that Plaintiffs did not adequately allege threatened injury.

Noting the impropriety of Defendants' new arguments regarding market power and definition of a relevant market (as allegedly related to "threatened injury"), but recognizing no need for further briefing on the topics, this court denies Plaintiffs' motion for leave to file a surreply. This court will, later in this Memorandum Opinion, address the sufficiency of Plaintiffs' Amended Complaint.

**III. DEFENDANTS' MOTION TO STAY**

In response to the Amended Complaint, Defendants filed a motion to stay the present action (Doc. 20) pending resolution of the State Lawsuit to which Plaintiffs responded (Doc. 26) and Defendants then replied (Doc. 27). As discussed herein, the parties primarily dispute whether Landis v. North American Co.,

299 U.S. 248 (1936), or <u>Colorado River Water Conservation Dist.</u> <u>v. United States</u>, 424 U.S. 800 (1976), controls the analysis.

Defendants ask the court to apply the balancing test from <u>Landis v. North American Co.</u>, 299 U.S. 248, 254-55 (1936), which they argue gives this court full discretion in deciding whether to impose a stay. (Br. in Supp. of Mot. to Stay ("Stay Br.") (Doc. 21) at 9.) Defendants argue that "[n]umerous reasons exist to support the exercise of the Court's discretion to stay this action" including:

> (1) the novel issues of State law raised that are already before Judge Bledsoe in the prior pending State Court Action; (2) Plaintiffs' overreaching attempt to impose liability on account of the prosecution of the prior pending State Court Action; (3) Plaintiffs' admissions that they seek resolution of identical issues contained in the prior pending State Court Action; and (4) reasons of economy and efficiency.

(<u>Id.</u> at 10.) Primarily, Defendants argue that "[i]f the prior pending State Court Action results in a determination that dry needling is the practice of acupuncture (which would establish that Defendants' alleged conduct was within its statutory authority) then all of Plaintiffs' claims in this action will fail." (<u>Id.</u> at 11.)

Plaintiffs respond that "[t]he balancing test in <u>Landis</u> . . . does not govern a motion that asks a federal court

- 14 -

to defer to a state-court proceeding," instead suggesting that the law of abstention applies. (Doc. 26 at 1.) Further, Plaintiffs argue that "[c]ourts reject abstention when, as here, a federal lawsuit contains antitrust claims." (Id.) Finally, Plaintiffs argue that, "even if the Acupuncture Board's motion did involve a balancing test, that test would not allow a stay here." (Id. at 2.) In reply, Defendants suggest Plaintiffs are "arguing that this Court does not have the inherent authority to control its own docket." (Doc. 27 at 1.)

When considering whether to stay a federal proceeding during the pendency of a similar state court action, the Fourth Circuit has used both the Landis doctrine (see Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 127 (4th Cir. 1983)) and the Colorado River doctrine (see Cox v. Planning Dist. I Cmty. Mental Health & Mental Retardation Servs. Bd., 669 F.2d 940, 942–43 (4th Cir. 1982)). The Fourth Circuit recently used the Colorado River doctrine in a situation of "abstention in favor of ongoing, parallel state proceedings . . . ." Ackerman v. ExxonMobil Corp., 734 F.3d 237, 248 (4th Cir. 2013); see MidAtlantic Int'l, Inc. v. AGC Flat Glass N. Am., Inc., 497 F. App'x 279, 281 (4th Cir. 2012); Chase Brexton Health Servs.,

- 15 -

Inc. v. Maryland, 411 F.3d 457, 461 (4th Cir. 2005). This court concludes that a stay is not appropriate under either analysis.

### A.   __Abstention__

"Abstention . . . is the exception, not the rule. The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 14 (1983) (emphasis added) (internal quotation marks omitted). "As has been reiterated time and again, the federal courts have a virtually unflagging obligation to exercise the jurisdiction given them." Gannett Co. v. Clark Const. Grp., Inc., 286 F.3d 737, 741 (4th Cir. 2002) (internal punctuation and quotation marks omitted). Further, "the existence of proceedings in state court does not by itself preclude parallel proceedings in federal court." New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am., 946 F.2d 1072, 1073 (4th Cir. 1991).

### B.   __The Colorado River Doctrine__

"In order for a federal court to abstain under the Colorado River doctrine, two conditions must be satisfied." Sto Corp. v. Lancaster Homes, Inc., 11 F. App'x 182, 186 (4th Cir. 2001). The

- 16 -

Fourth Circuit has summarized the approach for applying the

Colorado River doctrine:

> The threshold question in deciding whether
> Colorado River abstention is appropriate is whether
> there are parallel federal and state suits. If
> parallel suits exist, then a district court must
> carefully balance several factors, with the balance
> heavily weighted in favor of the exercise of
> jurisdiction. Although the prescribed analysis is not
> a "hard-and-fast" one in which application of a
> "checklist" dictates the outcome, six factors have
> been identified to guide the analysis: (1) whether the
> subject matter of the litigation involves property
> where the first court may assume in rem jurisdiction
> to the exclusion of others; (2) whether the federal
> forum is an inconvenient one; (3) the desirability of
> avoiding piecemeal litigation; (4) the relevant order
> in which the courts obtained jurisdiction and the
> progress achieved in each action; (5) whether state
> law or federal law provides the rule of decision on
> the merits; and (6) the adequacy of the state
> proceeding to protect the parties' rights.

Chase Brexton Health Servs., 411 F.3d at 463–64 (citations and

quotations omitted). Thus, Colorado River and Chase Brexton

require parallel proceedings and a balance of factors before

imposing a stay or abstention.

## 1. **Parallel Suits**

This court's analysis begins with "[t]he threshold question

. . . whether there are parallel federal and state suits."

Chase Brexton Health Servs., 411 F.3d at 463. "Suits are

parallel if substantially the same parties litigate

substantially the same issues in different forums." New Beckley,

- 17 -

946 F.2d at 1073. Here, the state and federal lawsuits at issue involve "substantially the same parties." Chase Brexton Health Servs., 411 F.3d at 464. Plaintiffs in the present federal action include two physical therapists who perform dry needling, two physical therapists who would like to perform dry needling and two dancers who receive dry needling. (Am. Compl. (Doc. 19) ¶ 7.) Defendants in the present federal action are the Acupuncture Board and individual acupuncturists who make up the Acupuncture Board. (Id. ¶¶ 15-21.) Defendants brought the State Lawsuit against the Physical Therapy Board (id. ¶ 116) and later amended their complaint to include Dr. Henry and Dr. Schulenklopper. (Id. ¶ 124.) It appears the parties are substantially the same for the purposes of the Colorado River analysis.

However, it is not as clear that the issues are sufficiently similar in both proceedings to support a finding of "parallel proceedings" under Chase Brexton. The issue in the State Lawsuit is "a novel issue of State law — i.e., whether or not North Carolina recognizes a procedure termed 'dry needling' as being within the practice of acupuncture in North Carolina." (Stay Br. (Doc. 21) at 1.) In the Amended Complaint, Plaintiffs allege that "[t]he Lawsuit seeks a declaration that dry needling

by licensed physical therapists constitutes the unlawful practice of acupuncture" and that "[t]he Lawsuit requests a permanent injunction requiring the Physical Therapy Board to advise its licenses that dry needling is not within the scope of physical therapy practice." (Am. Compl. (Doc. 19) ¶ 117.)

The present federal case, according to the Amended Complaint, poses different issues. Citing the Sherman Act, Count 1 of the present suit charges Defendants with a "contract, combination or conspiracy, in restraint of trade." (Id. ¶ 158.) Count 1 alleges that Defendants "caused actual anticompetitive effects" including "deterring competitors from entering the relevant market," "reducing rivalry and price competition within the relevant market" and "reducing consumer choice within the relevant market." (Id. ¶ 170.) Citing 42 U.S.C. § 1983, Count 2 alleges that Defendants deprived Plaintiffs of their "liberty interest and [] property interest in pursuing their right to earn a living in their current professions." (Id. ¶ 185.) Neither Count 1 nor Count 2 makes any mention of whether dry needling constitutes acupuncture. Both counts focus on the allegedly culpable behavior of Defendants, whether in restriction of trade or in deprivation of Plaintiffs' Constitutional rights. Even if Defendants were to prevail in the

State Lawsuit, "Plaintiffs may be able to convince a federal jury that despite [Defendants'] meritorious results in state court, those actions in combination with other acts amounted to anti-competitive behavior." W.W. Enter., Inc. v. Charlotte Motor Speedway, Inc., 753 F. Supp. 1326, 1332 (W.D.N.C. 1990).

This court finds a recent case, North Carolina State Board of Dental Examiners v. F.T.C., 717 F.3d 359 (4th Cir. 2013), to be factually similar and persuasive of the present issue. As outlined above, Defendants contend that this court should impose a stay until the State Lawsuit determining whether dry needling is a form of acupuncture can be resolved. Defendants contend that such a determination is relevant to this court's analysis of Plaintiffs' underlying Sherman Act claims.

As relevant here, in the Dental Examiners case, "North Carolina's Dental Practice Act provides that it is unlawful for an individual to practice dentistry in North Carolina without a license from the Board." N.C. State Bd. of Dental Exam'rs v. F.T.C., 717 F.3d 359, 364 (4th Cir. 2013), aff'd, ____ U.S. ____, 135 S. Ct. 1101 (2015). Additionally, "[u]nder the Dental Practice Act, a person shall be deemed to be practicing dentistry if that person, inter alia, removes stains, accretions

or deposits from the human teeth."[2] Id. (emphasis added)
(internal quotation marks omitted).[3]

Like the present case, the Dental Examiners Board "does not
have the authority to discipline unlicensed individuals or to
order non-dentists to stop violating the Dental Practice Act."
Id. at 364. Despite this, "the Board issued at least 47 cease-
and-desist letters to 29 non-dentist teeth-whitening providers"
which "caused non-dentists to stop providing teeth-whitening
services in North Carolina and also caused manufacturers and
distributors of teeth-whitening products used by these non-
dentist providers to exit or hold off entering North Carolina."
Id. at 365.

Relevant to the present issue of the propriety of a
potential stay, neither the Fourth Circuit nor the Supreme Court
placed any emphasis on whether teeth whitening in fact
constituted the practice of dentistry. The merits of that

---

[2] This quoted text would seem to provide strong support for
the dentists' claim that teeth whitening constituted the
unauthorized practice of dentistry — a claim that, as discussed
below, the Fourth Circuit did not consider an impediment to its
ruling.

[3] In an introductory comment, the Supreme Court noted that,
"[t]he Act does not specify that teeth whitening is 'the
practice of dentistry.'" N.C. State Bd. of Dental Exam'rs v.
F.T.C., ____ U.S. ____, ____, 135 S. Ct. 1101, 1104 (2015).

particular consideration played no role in the Fourth Circuit's determination that "substantial evidence supports the FTC's factual findings regarding the economic effects of the Board's actions and that those findings support the conclusion that the Board's behavior violates § 1." Id. at 375. As in the Dental Examiners case, the Acupuncture Board has not pointed to any statutory or regulatory language specifying "that [dry needling] is the practice of [acupuncture]." See Dental Exam'rs, 135 S. Ct. at 1104. It may well be that the State Lawsuit results in a determination that dry needling is the practice of acupuncture, but at the present time, the Amended Complaint alleges that the Physical Therapy Board has "expressly determined that dry needling is within the scope of practice of physical therapy." (Am. Compl. (Doc. 19) ¶¶ 39-40.) The State Lawsuit may result in some change to that alleged status, but Defendants have not demonstrated any possibility that the State Lawsuit would retroactively apply to the historical facts alleged by Plaintiff.  As a result, this court concludes that this case and the State Lawsuit are not parallel proceedings because the issues are different.

## 2. **Balancing Factors**

This court now turns to the second consideration for Colorado River abstention, as described by Chase Brexton, specifically focusing on factors "(5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights." 411 F.3d at 463–64.

With regards to factor (5), antitrust jurisdiction (including claims arising under the Sherman Act, such as Count 1) is exclusively federal. Kruse v. Snowshoe Co., 715 F.2d 120, 124 (4th Cir. 1983). As such, factor (6) weighs heavily against abstention in the present case. "While the Fourth Circuit has yet to address the impact of claims subject to exclusive federal jurisdiction on the Colorado River analysis, some courts have declined to abstain when a lawsuit includes a claim that is subject to exclusive federal jurisdiction." Krieger v. Harris Teeter Supermarkets, Inc., No. 3:13CV453, 2013 WL 5304847, at *4 (W.D.N.C. Sept. 19, 2013) (collecting cases). On at least one occasion, the Fourth Circuit has recognized this reasoning when a "case involves federal antitrust claims. Thus, not only is the source of law on that portion of the action federal, but the district court has exclusive jurisdiction over those claims."

- 23 -

<u>Kruse</u>, 715 F.2d at 124; <u>see also</u> <u>Andrea Theatres, Inc. v.</u>
<u>Theatre Confections, Inc.</u>, 787 F.2d 59, 63 (2d Cir. 1986)
("Claims 1 and 2 of the complaint seek relief under the private
enforcement provision of the Clayton Act, which is only
available in federal court and is predicated on federal rights.
Even apart from the grant of exclusive federal jurisdiction, the
possibility that the state court will conclusively resolve the
Theaters' anti-trust claims is slim."). Further, one court noted
that the "only forum available for Plaintiffs to bring their
Sherman Act claims is in federal court. . .[and] that the issues
presented in the federal case will most likely have to be
litigated in a federal forum regardless of the result in the
state case." <u>W.W. Enter.</u>, 753 F. Supp. at 1332 (internal
quotations omitted).

Because the issues between the state and federal
proceedings are not "parallel" and because Plaintiffs could not
vindicate their rights under the Sherman Act in state court,
this court finds that abstention, even temporarily, is improper
under <u>Colorado River</u>.

C.   **The Landis Doctrine**

Turning to the <u>Landis</u> doctrine, the

[Power to grant a discretionary stay pending state
court proceedings under <u>Landis</u>] in the district courts

- 24 -

> is well recognized. It is not, however, without
> limitation. . . . [P]roper use of this authority calls
> for the exercise of judgment which must weigh
> competing interests and maintain an even balance. The
> party seeking a stay must justify it by clear and
> convincing circumstances outweighing potential harm to
> the party against whom it is operative. The suppliant
> for a stay must make out a clear case of hardship or
> inequity in being required to go forward, if there is
> even a fair possibility that the stay for which he
> prays will work damage to someone else.

Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 127
(4th Cir. 1983) (internal quotation marks omitted). "The grant
or denial of a request to stay proceedings calls for an exercise
of the district court's judgment to balance the various factors
relevant to the expeditious and comprehensive disposition of the
causes of action on the court's docket." Maryland v. Universal
Elections, Inc., 729 F.3d 370, 375 (4th Cir. 2013) (internal
quotation marks omitted). "Courts have identified these various
factors to include the interests of judicial economy, the
hardship and inequity to the moving party in the absence of a
stay, and the potential prejudice to the non-moving party in the
event of a stay." Yadkin Riverkeeper, Inc. v. Duke Energy
Carolinas, LLC, 141 F. Supp. 3d 428, 452 (M.D.N.C. 2015); White
v. Ally Fin. Inc., 969 F. Supp. 2d 451, 462 (S.D. W. Va. 2013);
Sehler v. Prospect Mortg., LLC, No. 1:13cv473 (JCC/TRJ), 2013 WL
5184216, at *2 (E.D. Va. Sept. 16, 2013); Johnson v. DePuy

<u>Orthopaedics, Inc.</u>, C/A No. 3:12-cv-2274-JFA, 2012 WL 4538642, at *2 (D.S.C. Oct. 1, 2012).

First, this court must consider "the interests of judicial economy." <u>Yadkin Riverkeeper</u>, 141 F. Supp. 3d at 452. Defendants argue that "[i]f the prior pending State Court Action results in a determination that dry needling is the practice of acupuncture (which would establish that Defendants' alleged conduct was within its statutory authority) then all of Plaintiffs' claims in this action will fail." (Stay Br. (Doc. 21) at 11.) As analyzed above, this court concludes that the State Lawsuit and the present proceedings revolve around different issues, so the potential for "needless duplication of work and the possibility of inconsistent rulings" do not weigh heavily in favor of granting a stay because the present litigation will continue regardless of the result of the State Lawsuit. <u>Sehler</u>, 2013 WL 5184216, at *2. This court assumes the veracity of plausibly-pleaded facts, and the Amended Complaint alleged that dry needling is presently considered physical therapy and regulated by the Physical Therapy Board. (Am. Compl. (Doc. 19) ¶¶ 38-45.) The state court's determination is therefore not irrelevant; but on balance, the limited relevance is not sufficient to suggest judicial economy would be served

- 26 -

significantly by a stay. Further, as suggested above, Defendants have presented no authority suggesting that a favorable resolution of the State Lawsuit would retroactively relieve them of antitrust liability.

Second, this court must consider "the hardship and inequity to the moving party in the absence of a stay." Yadkin Riverkeeper, 141 F. Supp. 3d at 452. Without a stay, Defendants will have to continue to defend this litigation while pursuing their claims in the State Lawsuit. However, Defendants do not face the risk of duplicative or inconsistent verdicts against them, as they are the plaintiffs in the State Lawsuit. Further, because the State Lawsuit and the present litigation may concern similar issues of fact (despite different issues of law), Defendants will be working with at least some of the same witnesses and producing the same documents during discovery, which would not result in significant prejudice.

Finally, this court must consider "the potential prejudice to the non-moving party in the event of a stay." Yadkin Riverkeeper, 141 F. Supp. 3d at 452. If this court were to impose a stay, any injury that Plaintiffs are allegedly suffering or have already suffered as a result of Defendants' allegedly anticompetitive conduct would be allowed to persist

for the pendency of the State Lawsuit and any ensuing appeals. See id. at 453. Further, as noted above, because Plaintiffs' antitrust claims are claims of exclusively federal jurisdiction, to delay these proceedings would be to deprive Plaintiffs of their only method of pursuing these rights. While Defendants would remain free to present evidence that dry needling is acupuncture, thereby limiting injury in the absence of a stay, Plaintiffs' injury in the face of a stay is significant and this factor therefore weighs in favor of denying the motion.

"In short, the defendant has failed to make a 'clear case of hardship or inequity' as required by Landis and Williford." White v. Ally Fin. Inc., 969 F. Supp. 2d 451, 463 (S.D. W. Va. 2013). As such, Defendants' motion to stay will be denied under both the Colorado River and Landis doctrines.

IV. **DEFENDANTS' MOTION TO DISMISS**

A. **Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible provided the plaintiff provides enough factual content

- 28 -

to enable the court to reasonably infer that the defendant is liable for the misconduct alleged. Id. The pleading setting forth the claim must be "liberally construed" in the light most favorable to the nonmoving party, and allegations made therein are taken as true. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).

However, "the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege any facts [that] set forth a claim." Estate of Williams-Moore v. Alliance One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004).

Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see Iqbal, 556 U.S. at 662.

Under Iqbal, the court performs a two-step analysis. First, it separates factual allegations from allegations not entitled to the assumption of truth (i.e., conclusory allegations, bare assertions amounting to nothing more than a "formulaic recitation of the elements"). Iqbal, 556 U.S. at 681. Second, it determines whether the factual allegations, which are accepted

as true, "plausibly suggest an entitlement to relief." Id. "At this stage of the litigation, a plaintiff's well-pleaded allegations are taken as true and the complaint, including all reasonable inferences therefrom, are liberally construed in the plaintiff's favor." Estate of Williams-Moore, 335 F. Supp. 2d at 646.

**B.   Sherman Act Claim**

In support of their motion to dismiss Count 1 of Plaintiffs' Amended Complaint, Defendants contend that "Plaintiffs fail to sufficiently allege that (1) Defendants' conduct has a substantial effect on interstate commerce; (2) the necessary antitrust injury; or (3) the specific conduct of each individual defendant regarding the alleged conspiracy." (Defs.' Br. in Supp. of Mot. to Dismiss Am. Compl. ("Mot. to Dismiss Br.") (Doc. 23) at 8.) Plaintiffs respond to each argument in turn (Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Resp.") (Doc. 28) at 4-13.) As discussed above, in addition to further arguing the sufficiency of Plaintiffs' injury allegations, Defendants raise new arguments regarding relevant market and market power in their reply. (Doc. 32 at 3-8.)

i.  **Substantial Effect on Interstate Commerce**

First, Defendants argue that "Plaintiffs Do Not Allege a Substantial Effect on Interstate Commerce." (Mot. to Dismiss Br. (Doc. 23) at 8.) Defendants assert that Plaintiffs' use of the phrase "'in North Carolina' more than thirty times to describe the purely intrastate conduct at issue, is again self-defeating." (Id. at 8-9.) Defendants also argue that Plaintiffs' use of the phrase "'upon information and belief'" are "'legal or speculative' conclusory allegations [which] do not identify any actual harm with the requisite plausibility and cannot support an anti-trust claim." (Id. at 9-10.)

Plaintiffs agree that, "[t]o state a violation of the Sherman Act, a plaintiff must allege a 'substantial effect on interstate commerce.'" (Pls.' Resp. (Doc. 28) at 5) (citing Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 744 (1976)).) Plaintiffs argue that "the complaint contains over three pages of allegations that describe the substantial effects on interstate commerce that the [Acupuncture] Board's conduct has caused, and will cause . . . ." (Id. at 6.) In the Amended Complaint, Plaintiffs allege six "substantial effects on interstate commerce" and twelve "threatened additional substantial effects on interstate commerce." (Am. Compl. (Doc.

19) ¶¶ 173-74.) Plaintiffs allege that physical therapists have refrained from purchasing dry needling equipment from out-of-state manufacturers or from taking dry needling classes from out-of-state education programs as a result of Defendants' actions. (Id.) Further, Plaintiffs allege that Defendants' behaviors have affected the revenues of out-of-state insurance companies that reimburse North Carolina physical therapists who would be performing dry needling. (Id.) Whether these allegations are in fact true or accurate, they are at least plausibly alleged and therefore sufficient.

Contrary to Defendants' assertions regarding the purportedly "intrastate" nature of Plaintiffs' claims, "the fact that an effect on interstate commerce might be termed 'indirect' because the conduct producing it is not 'purposely directed' toward interstate commerce does not lead to a conclusion that the conduct at issue is outside the scope of the Sherman Act." Rex Hosp., 425 U.S. at 744. The Sherman Act is satisfied even when alleged actions "substantially affected interstate commerce . . . as a matter of practical economics" when more or less purchases from out-of-state retailers or wholesalers occur as a result of the alleged actions. Id.

Further, complaints with similar allegations as to the
impact on interstate commerce have survived motions to dismiss.
See Ballard v. Blue Shield of S. W. Virginia, Inc., 543 F.2d
1075, 1077 (4th Cir. 1976) ("The complaint alleges that the
defendants' violations of the Sherman Act adversely affect
interstate commerce by reducing the sale of therapeutic devices
and equipment that are manufactured outside of West Virginia and
purchased by chiropractors and their patients in the state . . .
[and] that the violations increase the cost of health care to a
substantial number of patients who travel in interstate commerce
for chiropractic treatment, and that the defendants' monopoly
injures interstate insurance companies that pay chiropractic
claims."); O'Leary v. Purcell Co., No. C-83-691-R, 1984 WL 1148,
at *4-5 (M.D.N.C. June 11, 1984) ("The conduct complained
of . . . occurred in the flow of interstate commerce or
substantially affected interstate commerce, the vast majority of
the purchasers of resort housing from both Plaintiffs and
Defendants coming from outside of North Carolina; many of the
purchasers of resort housing from Plaintiffs and Defendants not
having relocated to North Carolina, and continuing to pay
mortgages on the resort housing through interstate mail and
banking facilities; and the conduct of Defendants resulting in a

- 33 -

reduction of the amount of resort housing constructed by Plaintiffs."); In re Mid-Atl. Toyota Antitrust Litig., 525 F. Supp. 1265, 1280 (D. Md.), modified, 541 F. Supp. 62 (D. Md. 1981), aff'd sub nom. Com. of Pa. v. Mid-Atl. Toyota Distributors, Inc., 704 F.2d 125 (4th Cir. 1983).

Plaintiffs also point to the fact that some of their alleged impacts on interstate commerce "are identical to the interstate effects in Rex Hospital." (Pls.' Resp. (Doc. 28) at 6.) The complaint in Rex Hospital included allegations that "if respondents and their coconspirators were to succeed in blocking petitioner's planned expansion, petitioner's purchases of out-of-state medicines and supplies as well as its revenues from out-of-state insurance companies would be thousands and perhaps hundreds of thousands of dollars less than they would otherwise be." 425 U.S. at 744. Additionally, the Rex Hospital complaint alleged that "the management fees that petitioner pays to its out-of-state parent corporation would be less if the expansion were blocked. Moreover, the multimillion-dollar financing for the expansion, a large portion of which would be from out of State, would simply not take place if the respondents succeeded in their alleged scheme." Id. This court finds that Plaintiffs

have satisfied their obligation, at this stage, to plausibly allege an impact on interstate commerce.

### ii.   **Injury in Fact and Antitrust Injury**

Second, Defendants allege that "Plaintiffs have not suffered any injury – dry needling is still being performed by physical therapists . . . [and] the purported consumers . . . affirmatively allege that they continue to receive dry needling without interruption." (Mot. to Dismiss Br. (Doc. 23) at 13.) Defendants further argue that "Plaintiffs fail to allege that the prices charged by physical therapists for dry needling have changed or that acupuncturists . . . have increased the prices charged for their services. . . . [Thus], the market has not been injured." (Id. at 13-14.)

Antitrust injury involves two distinct questions . . . whether the plaintiff has indeed suffered harm, or injury-in-fact . . . [and] whether any such injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 344-45 n.13 (D. Md. 2012), amended, 962 F. Supp. 2d 840 (D. Md. 2013) (internal quotations omitted); see Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990).

- 35 -

## (a)  **Injury in Fact**

In support of the first question (injury in fact), the Amended Complaint alleges that "[t]he Acupuncture Board has dampened demand for dry needling through its anticompetitive acts" and that these acts "have deterred North Carolina consumers within the relevant market from seeking dry needling services from [Plaintiffs]." (Am. Compl. (Doc. 19) ¶ 132.) Additionally, "the Acupuncture Board's anticompetitive acts . . . have deterred Dr. Carter and Dr. Jones from entering the relevant market," depriving them of "substantial profits if they and their respective practices had been able to enter the relevant market." (Am. Compl. (Doc. 19) ¶¶ 135, 139.) Finally, Plaintiffs allege that the Acupuncture Board's "anticompetitive exclusion will deprive Ms. Burkhard-Catlin and Ms. Purrington of the benefits of consumer choice and price competition in the relevant market." (Am. Compl. (Doc. 19) ¶ 153.)

Defendants' arguments that Plaintiffs have not experienced any injury, as evidenced by the fact that they continue to perform and receive dry needling, is not persuasive, as "[t]he 'injury' in the typical antitrust case is relative in nature." Lee-Moore Oil Co. v. Union Oil Co. of California, 599 F.2d 1299, 1305 (4th Cir. 1979) (internal quotations omitted). The Fourth

Circuit has noted that "a plaintiff need not prove that competition has actually been diminished in order to show antitrust injury." Id. at 1304. "No matter how thriving his business may be, no matter how large his rate of profit may be, no matter how impressive his annual report may be, the substance of his claim is that he would have been even Better off if the defendant's alleged misdeeds had never taken place." Id. at 1305. This court finds that Plaintiffs have sufficiently alleged injury in fact.

### (b) <u>Antitrust Injury</u>

The second question as to antitrust injury is whether Plaintiffs' alleged damages constitute "injur[ies] of the type the antitrust laws were intended to prevent . . . ." Atl. Richfield Co., 495 U.S. at 334. Plaintiffs allege that "by expelling a popular horizontal competitor from the relevant market, the Acupuncture Board will eliminate price competition for Ashi point needling services." (Am. Compl. (Doc. 19) ¶ 155.) Defendants contend that "injury to oneself is insufficient to support an antitrust claim" and that "a party is not permitted

to allege lost profits 'upon information and belief.'"[4]  (Mot. to Dismiss Br. (Doc. 23) at 14.)

"[A]ntitrust laws were enacted for the protection of competition, not competitors, [and] a plaintiff must show that the net effect of a challenged restraint is harmful to competition." Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508 (4th Cir. 2002) (internal quotations omitted). "Lost profits and the costs of finding alternatives to mitigate the damages caused by an antitrust violation may constitute antitrust injury." Id. Antitrust liability exists when "the challenged conduct is, at its core, concerted action excluding a lower-cost and popular group of competitors, and no advanced degree in economics is needed to recognize that the behavior is likely to harm competition and consumers, absent a compelling justification." Dental Exam'rs, 717 F.3d at 374 (internal quotations and citations omitted).

---

[4] None of the cases that Defendants cite for this proposition are antitrust cases. Specifically, "in antitrust cases . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 (1976). The reason for any alleged lost profits depends upon the knowledge and actions within a relevant market involving third parties. As a result, this court does not find allegations made "upon information and belief" as to damages to be a basis for dismissal in this case.

Plaintiffs allege that physical therapists performing dry needling are "a popular type of horizontal competitor" to acupuncturists and that, because the procedures are covered by some insurance plans, dry needling is cheaper than acupuncture. (Am. Compl. (Doc. 19) ¶¶ 54-56, 161.) Plaintiffs further allege that "[w]ithout an alternative to Ashi point needling, there will be no barrier to raising the price for Ashi point needling services." (Id. ¶ 155.) In Dental Examiners, the Fourth Circuit imposed antitrust liability because "[i]t is not difficult to understand that forcing low-cost teeth-whitening providers from the market has a tendency to increase a consumer's price for that service." 717 F.3d at 374. Here, Defendants similarly attempt to "force low-cost [dry needlers] from the market," which this court recognizes would "[have] a tendency to increase a consumer's price . . . ." Id. This court agrees with Plaintiffs and finds that the Amended Complaint adequately alleges "the type of injuries the antitrust laws were intended to prevent." (Id. ¶ 156.)

### iii. Existence of a Conspiracy

Third, Defendants argue that "Plaintiffs Fail to Sufficiently Allege the Existence of a Conspiracy." (Mot. to Dismiss Br. (Doc. 23) at 15.) Relying upon district court cases

from Michigan and Ohio, Defendants argue that Plaintiffs are required to individually assign wrongful acts to each named defendant in the case and that "Plaintiffs do not allege specific acts of each of the individual members." (Id. at 16.) In response, Plaintiffs point to paragraphs 65 to 129 of the Amended Complaint (Doc. 19) and provide a list of examples, which they allege "plead[] the details of explicit agreements among the Defendants and their fellow acupuncturists." (Pls.' Resp. (Doc. 28) at 12.) Plaintiffs also allege that "e-mails between [the Acupuncture Board's] members, confirm that its members, after extensive discussion, reached an explicit agreement to engage in the anticompetitive conduct described above." (Am. Compl. (Doc. 19) ¶ 163.)

15 U.S.C. § 1 states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." "Section [O]ne's prohibition against restraint of trade applies only to concerted action, which requires evidence of a relationship between at least two legally distinct persons or entities." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 424 (4th Cir. 2015), as amended on reh'g in part (Oct. 29, 2015), cert. denied, ____ U.S. ____, 136 S. Ct.

2485 (2016) (internal quotations omitted). Stating a claim under Section One of the Sherman Act "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement . . . simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 556. "[T]he complaint must specify how these defendants were involved in the alleged conspiracy, without relying on indeterminate assertions against all defendants." SD3, LLC, 801 F.3d at 422 (internal quotation marks omitted). "A reviewing court must take account of the absence of a plausible motive to enter into the alleged conspiracy." Loren Data Corp. v. GXS, Inc., 501 F. App'x 275, 280 (4th Cir. 2012) (internal quotation marks omitted). Further, as a general matter of policy, "[i]n antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 144 (4th Cir. 1990) (quoting Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 747 (1976)).

Defendants allege that "Plaintiffs cannot escape their
burden of alleging that each defendant participated in the
alleged conduct." (Mot. to Dismiss Br. (Doc. 23) at 16.) In
paragraphs 164 to 169 of the Amended Complaint (Doc. 19),
Plaintiffs specifically allege the individual involvement and
acquiescence of each named Defendant. Here, however, "Plaintiff
has alleged something more than bare allegations of parallel
conduct and a recitation of the elements. For instance,
Plaintiff alleges an actual agreement initiated by specific
persons. Further, Plaintiff identifies specific persons involved
in the conspiracy and provides an approximate time period for
the alleged conspiracy." Milliken & Co. v. CNA Holdings, Inc.,
No. 3:08-CV-578, 2011 WL 3444013, at *5 (W.D.N.C. Aug. 8, 2011).
This court finds that Plaintiffs, in alleging each individual
Defendant's involvement with the alleged conspiracy as well as
the existence of e-mail responses indicating the participation
and acquiescence of each, have sufficiently alleged a conspiracy
for purposes of surviving a motion to dismiss.

Plaintiffs have also named the Acupuncture Board as a
defendant. (Am. Compl. (Doc. 19) ¶ 15.) While not binding on
this court, the Third Circuit has held that, "in assessing
whether a trade association (or any other group of competitors)

- 42 -

has taken concerted action, a court must examine all the facts and circumstances to determine whether the action taken was the result of some agreement, tacit or otherwise, among members of the association." Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1007–08 (3d Cir. 1994) (footnote and citations omitted). "The actions of a group of competitors taken in one name present the same potential evils as do the actions of a group of competitors who have not created a formal organization within which to operate." Id. at 1007. Further, "[a trade association] can only be held liable for concerted action if it acted as an entity." Id. Plaintiffs allege that the Acupuncture Board issued the Publication, sent the cease-and-desist letters and filed the State Lawsuit, as an entity, at the direction of its members. (Am. Compl. (Doc. 19) ¶¶ 81, 108, 116.) This court finds that the above allegations satisfy the pleading requirement at this stage.

### C.  **Equal Protection Claim**

In support of their motion to dismiss Count 2, Defendants claim that "Plaintiffs have not: (1) been deprived of anything; (2) identified any clearly established constitutional rights; or (3) alleged specific conduct of each defendant." (Mot. to

Dismiss Br. (Doc. 23) at 16-17.) Defendants also attempt[5] to incorporate a portion of the relevant analysis contained in their brief in support of the motion to dismiss (Doc. 13) filed December 22, 2015.

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

---

[5]      Plaintiffs note that "[t]he Board incorporates 12 pages of substantive argument from its December 22, 2015 motion-to-dismiss brief . . . for a total of 32 pages" and that "[t]he Board's 32-page brief violates this Court's Local Rules." (Pls.' Resp. (Doc. 28) at 2 n.1.) Local Rule 7.3(d) explicitly states that "[b]riefs in support of motions and responsive briefs are limited in length to 20 pages, and reply briefs are limited to 10 pages." LR7.3(d) (emphasis added). This court agrees with Plaintiffs that Defendants' incorporation is not permitted by the rules.

Plaintiffs allege that they "have a liberty interest and a property interest in pursuing their right to earn a living in their current professions." (Am. Compl. (Doc. 19) ¶ 185.) Plaintiffs do not, however, provide any legal basis for the conclusion that earning a living by performing dry needling is "a right secured by the Constitution and laws of the United States . . . ." Brooks v. Siler, No. 1:14CV794, 2015 WL 136093, at *2 (M.D.N.C. Jan. 9, 2015), appeal dismissed sub nom. Brooks v. Diaz, 610 F. App'x 254 (4th Cir. 2015), cert. denied sub nom. Brooks v. Dadma Lydia Diaz C., ____ U.S. ____, 136 S. Ct. 1177 (2016). In response to this argument, Plaintiffs reiterate that "the complaint expressly alleges that the physical-therapist plaintiffs have an interest in earning a living by pursuing the work of their choice . . . ."[6] (Pls.' Resp. (Doc. 28) at 13.)

For this proposition, Plaintiffs rely primarily upon Richardson v. Town of Eastover, 922 F.2d 1152 (4th Cir. 1991). However, as Defendants point out, Richardson is about "[a] license issued by the state [,] which can be suspended or

_____

[6] This court notes that simply alleging the existence of a Constitutional right in a complaint (here, the purported right to continue performing dry needling) is not sufficient, even for purposes of a 12(b)(6) motion, to establish such a right. Doing so would constitute pleading a "legal conclusion" under Iqbal, which the court is not required to accept as true. See Iqbal, 556 U.S. at 678-79.

revoked only upon a showing of cause [and which] creates a property interest protected by the Fourteenth Amendment." Id. at 1156. In the present case, Plaintiffs do not allege any deprivation of their license, which would support a finding that Richardson controls. Further, despite Plaintiffs' claim that Richardson establishes "both a liberty interest and property interest for substantive-due-process purposes" (Pls.' Resp. (Doc. 28) at 13), the case itself makes no mention of substantive due process, instead seeming to focus on procedural due process. Richardson, 922 F.2d at 1157. This court does not read Richardson to create a blanket Constitutional right to perform a certain kind of labor simply because a party had already begun to perform that kind of work or may have a license to perform that kind of work.

Plaintiffs provide no further support for their contention that they have a Constitutional right to perform dry needling and this court is unaware of any legal doctrine supporting such a claim. As stated above, because 42 U.S.C. § 1983 requires the allegation of an established Constitutional right and Plaintiffs have not alleged such a right, this court grants Defendants' Motion to Dismiss as to Count 2.

V.    <u>**CONCLUSION**</u>

For the reasons outlined above,

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Leave to File Surreply (Doc. 33) is **DENIED**, that Defendants' Motion to Stay (Doc. 20) is **DENIED,** and that Defendants' Motion to Dismiss Amended Complaint (Doc. 22) is **GRANTED IN PART AND DENIED IN PART.** The motion is **DENIED** as to Count One of Plaintiffs' Amended Complaint and **GRANTED** as to Count Two of Plaintiffs' Amended Complaint.

This the 30th day of January, 2017.

William L. Osteen, Jr.
_____
United States District Judge

- 47 -